UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SPERO THERAPEUTICS, INC. SECURITIES LITIGATION | Case No.  1:22-cv-03125-LDH-RLM |
| | <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO: All Actions | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT</u>

Date Served:   March 31, 2023

John F. Sylvia, Esq.
**MINTZ, LEVIN, COHN, FERRIS**
**GLOVSKY, AND POPEO, P.C.**
919 Third Avenue
New York, NY 10022
Tel: (617) 542-6000
Fax: (617) 542-2241
Email: JFSylvia@mintz.com
*Attorney for Defendants Spero Therapeutics, Inc., Ankit Mahadevia and Satyavrat Shukla*

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................................1

FACTS ...................................................................................................................................3

SOURCES OF FACTS STATED.............................................................................................3

CONFIDENTIAL WITNESSES. ............................................................................................3

RELEVANT FACTS. .............................................................................................................4

ARGUMENT .......................................................................................................................12

I.    The Court Should Dismiss The Section 10(b) Because The FAC Fails To Demonstrate A Duty To Disclose Or To Generate A Strong Inference Of Scienter. ................................12

    A.    The FAC Does Not Allege That The FDA Expressed A Binding Agency Decision About The Composition Of The Analysis Population Before The Late Cycle Meeting. ................................................................................................14

    B.    The FAC Does Not Support A Strong Inference That The FDA Expressed A Binding Agency Decision To Spero Before The End Of The Class Period. ............................14

    C.    The "Additional Facts Probative Of Scienter" Do Not, In Fact, Support An Inference of Culpability. ................................................................................................21

II.    The Court Should Dismiss The Section 20(a) Claim........................................................24

CONCLUSION.....................................................................................................................25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abely v. Aeterna Zentaris Inc.*,
2013 U.S. Dist. LEXIS 78388 (S.D.N.Y. May 29, 2013)............................................................5

*Bogulavsky v. Kaplan*,
159 F.3d 715 (2d Cir. 1998)....................................................................................................24

*BTG Int'l Ltd. v. Amneal Pharms. LLC*,
352 F. Supp. 3d 352 (D.N.J. 2018) ...........................................................................................8

*Bythewood v. New York*,
2022 U.S. Dist. LEXIS 180011 (E.D.N.Y. Sep. 30, 2022)..................................................3, 22

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002).......................................................................................................3

*Fialkov v. Alcobra Ltd.*,
2016 U.S. Dist. LEXIS 42633 (S.D.N.Y. Mar. 30, 2016) .......................................................23

*Finger v. Pearson PLC*,
2019 U.S. Dist. LEXIS 164585 (S.D.N.Y. Sep. 16, 2019)......................................................12

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015).....................................................................................................13

*Gen. Partner Glenn Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)................................................................................................13, 14

*In re Alkermes Pub. Co. Sec. Litig.*,
523 F. Supp. 3d 283 (E.D.N.Y. 2021) ............................................................................. *passim*

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014)........................................................................................12

*In re Sanofi Secs. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)...................................................................................13, 14

*Miss. Pub. Employees Ret. Sys. v. Boston Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008).......................................................................................................16

*Mucha v. Winterkorn*,
2022 U.S. App. LEXIS 6597 (2d Cir. Mar. 15, 2022)..............................................................12

*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*,
    2005 U.S. Dist. LEXIS 4300 (S.D.N.Y. Mar. 17, 2005) ........................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...............................................................................................................15

*Weinstein v. Kirkman*,
    2013 U.S. Dist. LEXIS 194270 (W.D.Wash. Sep. 16, 2013) ....................................................5

*Xerion Partners I LLC v. Resurgence Asset Mgmt.*,
    LLC, 474 F. Supp. 2d 505 (S.D.N.Y. 2007) ...........................................................................23

**Federal Statutes**

Exchange Act of 1934 .................................................................................................................3

§ 10(b) of the Exchange Act: (1) .......................................................................... *passim*

§ 20(a) of the Exchange Act ...........................................................................................3, 11, 24

Private Securities Litigation Reform Act .....................................................................................2

PSLRA, 15 U.S.C. § 78u-4(b)(2) ...............................................................................................13

**Rules**

Rule 10b-5 .................................................................................................................................11

Rule 10b5-1 ..............................................................................................................................24

**Regulations**

21 C.F.R. § 312.23(a)(6)(ii) .........................................................................................................5

21 C.F.R. § 312.23(a)(6)(iii)(c) ....................................................................................................6

21 C.F.R. § 314.50(d)(5)(ii) .........................................................................................................9

**Other Authorities**

Dorland's Illustrated Medical Dictionary (32nd ed.) ....................................................................7

Silhavy, Kahne, and Walker, *The Bacterial Cell Envelope*, vol. 2(5) ............................................7

## INTRODUCTION

The First Amended Complaint ("FAC") should be dismissed because it does not allege facts sufficient to establish two essential elements of its primary claim for a violation of Section 10(b) of the Exchange Act: (1) that the defendants had, at any relevant time, a ***duty to disclose*** the facts they supposedly concealed from investors, and (2) that the defendants acted with ***scienter***.

The Plaintiffs claim that the Defendants misled investors when they made certain statements about the outcome of a clinical trial for a drug that defendant Spero Therapeutics, Inc. ("Spero") had developed, and about the prospects for a New Drug Application ("NDA") that Spero had submitted to the federal Food and Drug Administration ("FDA"). According to the FAC, these statements were misleading by omission: The Defendants are supposed to have fraudulently concealed from investors that the clinical trial "lacked a sufficiently evaluable patient population and failed to generate data" demonstrating that the drug had met its "primary endpoint" of efficacy in relation to a comparator drug.

The Defendants, however, made all of the statements at issue on the basis of data analyzed in accordance with pre-specified criteria for including and excluding patients from the determination of efficacy, as set forth in both the formal protocol and Statistical Analysis Plan for the clinical trial. The statements at issue were all perfectly true in light of those criteria, which were well-known to the FDA when it, among other things, accepted Spero's Investigational New Drug application; designated the drug as a "Qualified Infectious Disease Product;" gave the New Drug Application a "Fast Track Designation;" attended a "pre-NDA meeting," designed to "uncover any major unresolved problems" with the clinical trial, without apparent comment on the composition of the patient population; and accepted the NDA for review on an accelerated schedule.

1

The FDA ultimately decided to change the composition of the analyzable patient population in a way that led to its wholesale exclusion of cases that had been properly included under the pre-specified criteria, and thus to the agency's rejection of the NDA. But even though the Plaintiffs advertise their access to a half-dozen "confidential witnesses," some of whom occupied "high-level" positions and were "in[side] the tent" when it came to the substance of Spero's interactions with the FDA, the FAC does not say anything about (1) *when* the FDA made this decision, (2) *when* or *how* the FDA communicated this decision to Spero, and (3) *what* the FDA had (or had not) said to Spero about the composition of the analyzable patient population at the time of any of the alleged misstatements. What the defendants knew, and when they knew it, are left to what the Plaintiffs call "inference," but what is—given the paucity of relevant facts alleged—better described as speculation, if not simply the Plaintiffs' imagination.

There is, consequently, a factual hole at the center of the FAC, and two related legal defects in the Section 10(b) claim. First, it is a matter of well-established law, in this Circuit and others, that a pharmaceutical company does not have a duty to disclose "interim feedback" from the FDA during the iterative process that takes place during the agency's review of a New Drug Application. Thus, no duty to disclose could have ripened here, where even the Plaintiffs' own counsel has characterized the FDA's comments to Spero as nothing more than "an interim discussion about the ultimate issue."

Second, because a defendant cannot culpably withhold information it has no duty to disclose, scienter may be inferred in this context only where the company's managers know at the time that certain facts will "necessarily" prevent regulatory approval, and conceals those facts from investors. The "strong" inference of scienter required by the Private Securities Litigation Reform Act ("PSLRA") cannot be made, moreover, where, as here, any negative feedback from the agency

2

was "muted" by encouraging regulatory decisions such as a Fast Track Designation and the acceptance of the defendant's NDA for accelerated review. The Section 10(b) claim thus fails as a matter of law, and the Section 20(a) claim for secondary, "control person" liability fails for lack of a viable primary violation.

## FACTS

The FAC asserts two claims for securities fraud under the Exchange Act of 1934. The Plaintiffs purport to represent a class of investors who purchased stock in Spero during a Class Period beginning September 8, 2020 and ending May 3, 2022. ¶2. Spero is a defendant, ¶19, as are Ankit Mahadevia, Spero's CEO during the Class Period, ¶20, and Satyavrat Shukla, who became the CFO on January 4, 2021. ¶21.

## SOURCES OF FACTS STATED.

The facts recited in this motion are primarily drawn from the FAC, and cited here as "¶--." A number of additional facts are derived from documents that the Court can and should consider because they are susceptible to judicial notice or because the FAC relies heavily upon them, rendering the documents integral to the complaint. *Bythewood v. New York*, 2022 U.S. Dist. LEXIS 180011, at *2, n.1 (E.D.N.Y. Sep. 30, 2022) (quoting *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) and *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Those documents are marked as "Exhibit --" and attached to the Declaration of John F. Sylvia.

## CONFIDENTIAL WITNESSES.

The FAC purports to be based in large part on information the Plaintiffs obtained from six "Non-Party Confidential Witnesses," or "CWs." ¶¶24-30. All six CWs were employed by Spero. ¶¶25-30. At least two of them had broad access to Spero's interactions with the FDA. CW2 was

3

an Associate Director in the Regulatory Affairs Department through May 2022, ¶26, and in that capacity "had access to Spero's internal database storing all regulatory documents, including all the submissions to the FDA." ¶49. CW5—a "high-level employee in Spero's commercial division"—was "brought 'into the tent,' *i.e.*, knowing what was happening vis-à-vis the FDA," especially with respect to the preparations for Spero's "Late Cycle Meeting" with the agency at the end of April 2022. ¶52.

The facts alleged in the FAC—and even more importantly, the facts *not* alleged in it— should be read in this light. For example, the FAC does not allege that the FDA told Spero, at any time before the Late Cycle Meeting, that in the agency's opinion the clinical trial supporting Spero's New Drug Application "lacked a sufficiently evaluable patient population." Since at least two of the Plaintiffs' informants were "in[side] the tent . . . vis-à-vis the FDA," and would have known it if the agency *had* stated this position, the absence of an allegation to that effect implies that the agency did *not* tell Spero anything of the sort—at least, not until the Late Cycle Meeting occurred, immediately before Spero disclosed the FDA's stance to investors.

## RELEVANT FACTS.

Spero developed an antibiotic that was designed to treat "complicated" urinary tract infections ("cUTI"), and that could be taken in pill form. Spero called the drug tebipenem HBr ("tebipenem"). If it proved to be safe and efficacious, tebipenem would be a boon to patients, doctors, and the medical system, because the carbapenems previously approved for treatment of cUTIs, such as ertapenem, had to be administered intravenously. ¶34. In the Plaintiffs' words: "The development of an orally administered treatment would be significant as it can prevent hospitalization or accelerate patient discharge and provide a cost-efficient alternative to IV treatment." ¶34.

For that reason, Spero and its regulators were both excited about tebipenem. In 2017, just as Spero initiated a Phase 1 clinical trial designed to test the safety and tolerability of tebipenem, the FDA designated the drug as a "Qualified Infectious Disease Product," ¶39. In 2018 Spero received a contract from the U.S. Biomedical Advanced Research and Development Authority ("BARDA"), granting at least $15.7 million in federal funding for the development of tebipenem. ¶44(d). Finally, in 2019, the FDA gave the drug a "Fast Track Designation," which "facilitates development and expedites review of drugs intended to treat serious or life-threatening conditions that demonstrate the potential to address unmet medical needs." ¶¶ 41, 44(g).

The results of the Phase 1 study were good. ¶44(e). Indeed, they were so positive that Spero was able to move directly from Phase 1 to a Phase 3 clinical trial. ¶44(c). In early 2019, after the FDA accepted Spero's Investigational New Drug ("IND") application, the company initiated patient enrollment into the Phase 3 trial, which was dubbed "ADAPT-PO." ¶41. Spero was required by regulation to support the IND application with a "detailed protocol[] describing all aspects of the study." 21 C.F.R. §312.23(a)(6)(ii). The protocol for ADAPT-PO informed the FDA that the purpose of the trial was to compare the safety and efficacy of orally-administered tebipenem to intravenous ertapenem in patients with either cUTI or acute polynephritis ("AP"). Sylvia Decl., Ex. A at 6.[1] Efficacy would be measured by the "overall response rate" for each drug,

---

[1]    The Court should take the study protocol, as well as the Statistical Analysis Plan ("SAP") for ADAPT-PO, Sylvia Decl., Ex. B, into account here. Both documents were submitted to the FDA and are available at the ClinicalTrials.gov website, and thus are properly subject to judicial notice. https://clinicaltrials.gov/ProvidedDocs/67/NCT03788967/Prot_000.pdf. Their contents, moreover, are needed to enable the Court to "compare the trials' publicly disclosed descriptions with the alleged misstatements," making the protocol "integral to the Complaint's allegations." *Abely v. Aeterna Zentaris Inc.*, 2013 U.S. Dist. LEXIS 78388, at *67 (S.D.N.Y. May 29, 2013) (taking notice of published study design in securities fraud case); *Weinstein v. Kirkman*, 2013 U.S. Dist. LEXIS 194270, at *3, n.2 (W.D.Wash. Sep. 16, 2013) (taking notice of published "clinical trial design document" in derivative suit alleging that defendants breached fiduciary duties by continuing clinical trial after it was known to have failed).

5

defined as the percentage of patients who achieved a combination of clinical cure and microbiological eradication of the causative pathogen. *Id.* at 13; *see also* ¶59(a). The trial would achieve its "primary endpoint" if tebipenem, delivered in pill form, demonstrated "non-inferiority" when compared to IV ertapenem, i.e., an "overall response rate" equal to or greater than 87.5% of the response rate for ertapenem, *id.*—or, to put it the other way round, if tebipenem achieved a "non-inferiority margin of -12.5%" compared to ertapenem. ¶60.

In compliance with FDA regulations, the protocol for ADAPT-PO also stated the "criteria for patient selection and for exclusion of patients…." 21 C.F.R. §312.23(a)(6)(iii)(c). Inclusion, for example, required a diagnosis of either cUTI or AP, but the protocol excluded people with other conditions that might "confound the assessment of efficacy." Sylvia Decl., Ex. A at 9-10. These inclusion/exclusion criteria were later repeated, almost verbatim, in the SAP for the ADAPT-PO trial. Sylvia Decl., Ex. B at 18-19.

Although cUTI and AP may be caused by a number of pathogens, the inclusion/exclusion criteria in the protocol did not limit entry into the trial on the basis of the identity of the micro-organism that was causing a particular subject's infection. The protocol and the SAP addressed that issue independently, and on the back end, providing that after the study concluded, the statistical analysis would be performed on data from a sub-population—known as the Microbiological Intent-to-Treat (or "Micro-ITT") Population—that excluded (1) subjects infected by more than two species of micro-organisms, and (2) subjects whose infections were "caused by a pathogen that is typically not expected to respond to either carbapenem study drug (e.g., *Acinetobacter* spp., *Stenotrophomonas* spp., *Pseudomonas aeruginosa*, *methicillin-resistant Staphylococcus aureus* [MRSA]….)." Sylvia Decl., Ex. A at 12, 76; Ex. B at 18.

Because the FAC repeatedly emphasizes the difference between "gram-positive" and "gram-negative" bacteria, *see, e.g.,* ¶¶4, 10, 31, 50, 52, 54, 55, it is important to note that the study protocol did ***not*** make such a distinction.[2] It neither excluded all infections caused by "gram-positive" pathogens from the micro-ITT population, nor granted blanket inclusion to all infections caused by "gram-negative" organisms. The protocol, rather, excluded bacteria from the analysis on a basis that had nothing to do with their reaction to a gram stain—specifically, whether or not they were "expected to respond to either carbapenem study drug"—and the list of excluded pathogens therefore included both a "gram-positive" pathogen (methicillin-resistant *Staphylococcus aureus*, also known as "MRSA"), and several "gram-negative" bacteria— *Acinetobacter*, *Stenotrophomonas*, and *Pseudomonas aeruginosa.* Sylvia Decl., Ex. A at 12, 76; *see also* Dorland's Illustrated Medical Dictionary (32nd ed.) at 16 (defining *Acinetobacter* as gram-negative), 1544 (defining *Pseudomonas* as gram-negative), 1770 (defining *Stenotrophomonas* as gram-negative), 1184 and 1765 (defining MRSA as gram-positive).

Spero completed enrollment of ADAPT-PO by May 2020, enrolling 1,372 study subjects. ¶42. Because enrollment was on a rolling basis, and the trial had commenced more than a year earlier, the clinical investigators had been able to glean "positive incremental" data on tebipenem's pharmacokinetics even before ADAPT-PO reached that milestone, ¶44(h), and an independent review committee—after evaluating data on the first 70 patients enrolled in the trial—had already recommended that ADAPT-PO continue without dose modification. ¶44(i).

---

[2]    Bacteria are classified as gram-positive or gram-negative depending on their response to a staining procedure that was developed by a Danish bacteriologist named Christian Gram. *See* Silhavy, Kahne, and Walker, *The Bacterial Cell Envelope*, v.2(5) Cold Spring Harbor Perspectives in Biology (May 2010).

In September 2020, with the clinical portion of the trial complete and "top-line" data available to the investigators, Spero was able to announce that the Phase 3 trial had met its primary endpoint, demonstrating "non-inferiority" as compared to IV ertapenem "in the micro-ITT population" that had been defined in the study protocol and Statistical Analysis Plan. ¶59(a). Shortly thereafter, in October 2020, Spero published more detailed top-line data from ADAPT-PO. ¶71. This disclosure, and subsequent statements by the company, repeatedly made it clear that—consistent with the study protocol and the SAP—the micro-ITT population on which the non-inferiority analysis was based included both gram-negative and gram-positive pathogens. ¶¶4, 71(a), 71(c), 93(a), 129(a), 131, 135(a). Among other things, in October 2020 Spero issued a press release that explicitly "displayed the percentages of patients in micro-ITT broken down by gram-negative pathogens and gram-positive pathogens," ¶71(a), with a chart that listed the particular pathogens that comprised the micro-ITT population, including four gram-*positive* cocci, among them *Enterococcus faecalis* and *Enterococcus faecium*. ¶71(a), Figure 4(a). On the other hand, infections caused by *Acinetobacter*, *Stenotrophomonas*, *Pseudomonas aeruginosa*, and MRSA—the organisms (both gram-positive and gram-negative) that had been designated for exclusion by the protocol, Sylvia Decl., Ex. A at 12—were *not* included in the micro-ITT population, and they consequently played no role in the investigators' analysis and had no effect on Spero's conclusion that ADAPT-PO had met its primary endpoint.

Spero told investors that it intended to initiate a "rolling" NDA, which would enable it to complete the submission in the second quarter of 2021. ¶59(a). Consistent with that schedule, Spero's representatives attended a "pre-NDA" meeting with the FDA in March 2021. ¶6. The purpose of a pre-NDA meeting is "for the FDA to provide initial feedback that would aid in the NDA review process," *BTG Int'l Ltd. v. Amneal Pharms. LLC*, 352 F. Supp. 3d 352, 369 (D.N.J.

8

2018), thus giving the applicant a chance to "uncover any major unresolved problems," and to "discuss appropriate methods for statistical analysis of the data." *In re Alkermes Pub. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 286 (E.D.N.Y. 2021) (quoting 21 C.F.R. §312.47(b)(2)).

Although the scope of the study protocol and the resulting composition of the micro-ITT population were matters of both public and agency knowledge at the time, nothing in the FAC suggests that, when giving its initial feedback at the pre-NDA meeting, the FDA objected to, or even commented on, the inclusion of several strains of gram-positive bacteria in the micro-ITT population.

Spero then submitted its NDA, which as a regulatory matter must have included a description and analysis of the ADAPT-PO trial, "including the protocol and a description of the statistical analyses used to evaluate the study." 21 C.F.R. §314.50(d)(5)(ii). If the FDA did not already know it, in other words, the protocol must have informed the agency that the micro-ITT population included patients with gram-positive infections, and that Spero's analysis of the study had proceeded on that basis. Yet the FAC fails to suggest that the agency raised any caveats about the composition of the micro-ITT population before it accepted Spero's NDA for review and granted it "Priority Review" status at the beginning of January 2022. ¶119.

Beginning with the announcement of ADAPT-PO's "top-line data" on September 8, 2020, and continuing until January 25, 2022, Spero made a series of public statements that are at the heart of this lawsuit. ¶¶59-124. In the Form 8-K that it filed on September 8, 2020, for example, Spero announced that the Phase 3 clinical trial of oral tebipenem had "met the primary endpoint, demonstrating statistical non-inferiority versus IV ertapenem," and stated the company's intention to initiate a rolling NDA and to complete the submission in the second quarter of 2021. ¶¶59(a), (b). The documents attached to the Form 8-K said that the ADAPT-PO trial—which it described

as a "well-controlled pivotal" trial—would form the basis for the NDA, but they did not guarantee success or predict an outcome. ¶59(a)-(c).

Like the initial Form 8-K, all of the other alleged misstatements concerned the results of the ADAPT-PO trial and the progress of the NDA, and all of them—according to the Plaintiffs—were "materially false and misleading" for the same reason: because "the ADAPT-PO Trial lacked a sufficiently evaluable patient population and failed to generate data demonstrating that tebipenem HBr could meet the pre-specified non-inferiority margin of -12.5% compared to IV ertapenem that was necessary for FDA approval." ¶¶60, 62, 64, 66, 68, 70, 72, 74, 76, 78, 80, 82, 84, 86, 88, 90, 92, 94, 96, 98, 100, 102, 104, 106, 108, 110, 112, 114, 116, 118, 120, 122, 124. According to the Plaintiffs, the trial lacked a "sufficiently evaluable patient population" because the FDA ultimately decided to remove patients infected with gram-positive bacteria from the micro-ITT population, ¶52, and "[t]he effect of this new analysis was to reduce the number of evaluable patients in the primary analysis population compared with those resulting from the trial's pre-specified micro-ITT population as outlined in the statistical analysis plan" and the study protocol." ¶159.

When did the FDA make this decision to shrink the "analysis population," and when did it communicate its decision to Spero? The Plaintiffs' theory of the case, apparently, is that the FDA *must have* alerted Spero to its plan to remove gram-positive patients from the analysis population at *some point* during the alleged Class Period. However, unless the reader can make that inferential leap, and until it can make the leap to a reasonably specific point in time, there is nothing in the FAC to indicate that the FDA made its position clear to Spero at any moment before April 29, 2022, when representatives of Spero and the FDA attended the Late Cycle Meeting (or "LCM"). ¶9. According to CW5, the "high-level employee" in Spero's commercial division, ¶29, who was

10

"brought 'into the tent' and thus knew "what was happening vis-à-vis the FDA," ¶52, the FDA's decision to "remove patients infected with gram-positive bacteria" came up in "discussions around the LCM meeting." *Id.*, *see also* ¶169 ("based on discussions around Spero's LCM meeting with the FDA, the agency chose to exclude patients infected with gram-positive bacteria"). As far as the FAC discloses, though, none of the Confidential Witnesses said that the FDA's decision had come up, in "discussions" or otherwise, *before* the tail end of April 2022. Although CW5 was inside "the tent" when it came to discussions with the FDA, ¶52, and CW2 "worked to help the company respond to the FDA's inquiries and requests" about tebipenem, and was one of a handful of people given access to "all the FDA submission documents for tebipenem," ¶49, the FAC does *not* allege that the FDA made this decision, or communicated it to Spero, at any time before the Late Cycle Meeting.

As noted, the Late Cycle Meeting took place on Friday, April 29. The company's next relevant public statement came on the following Tuesday, May 3, 2022, when Spero issued a press release describing the FDA's "new analysis," and announcing that, as a consequence, the company would "immediately defer current commercialization activities for tebipenem HBr based on feedback from a recent Late Cycle Meeting (LCM) with the U.S. Food and Drug Administration…." ¶159. The FAC does not allege that any of the Defendants made any public misstatements between April 29 and May 3.

This lawsuit was filed on May 26, 2022. ECF No. 1. Count I alleges that Spero, Dr. Mahadevia, and Mr. Shukla violated Section 10(b) of the Exchange Act and Rule 10b-5. Count II alleges that Dr. Mahadevia and Mr. Shukla are liable as "control persons" for statements made by the company, under Section 20(a) of the Exchange Act.

11

**ARGUMENT**

I.      **The Court Should Dismiss The Section 10(b) Because The FAC Fails To Demonstrate A Duty To Disclose Or To Generate A Strong Inference Of Scienter.**

The Section 10(b) claim rests entirely on the premise that Spero's disclosures of positive data from the Phase 3 trial, its statements that the study had met its primary endpoint, and its updates on the progress of the NDA, were all false "because … the ADAPT-PO Trial lacked a sufficiently evaluable patient population and failed to generate data demonstrating that tebipenem HBr could meet the pre-specified non-inferiority margin of -12.5% compared to IV ertapenem that was necessary for FDA approval." ¶¶60, 62, 64, 66, 68, 70, 72, 74, 76, 78, 80, 82, 84, 86, 88, 90, 92, 94, 96, 98, 100, 102, 104, 106, 108, 110, 112, 114, 116, 118, 120, 122, 124.

Of course, it is not enough to allege that this was how things ultimately turned out: "fraud by hindsight" is a disallowed method of pleading both falsity and scienter. *Mucha v. Winterkorn*, 2022 U.S. App. LEXIS 6597, at *8 (2d Cir. Mar. 15, 2022) ("a plaintiff cannot cure a failure to plead a strong inference of scienter by adding allegations of 'fraud by hindsight'"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014) ("without contemporaneous falsity, there can be no fraud"). An allegedly material misstatement must have been false at the time it was made, *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d at 290, and consequently there is implicit in the element of scienter "the need to show what the defendants knew at the time of the alleged misrepresentations." *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, 2005 U.S. Dist. LEXIS 4300, at *7 (S.D.N.Y. Mar. 17, 2005). The courts will, accordingly, dismiss securities-fraud claims that "offer no details as to what Defendants knew, and when they knew it, that would have made their statements knowingly false." *Finger v. Pearson PLC*, 2019 U.S. Dist. LEXIS 164585, at *42 (S.D.N.Y. Sep. 16, 2019).

12

The fact that the information at issue concerns a New Drug Application to the FDA adds another wrinkle to the fabric of this case. Recognizing that "[c]ontinuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process," *Gen. Partner Glenn Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016), and that "[t]here must be some room for give and take between a regulated entity and its regulator," *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 244 (1st Cir. 2015), the federal courts have repeatedly "rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review." *In re Sanofi Secs. Litig.*, 87 F. Supp. 3d 510, 41 (S.D.N.Y. 2015) (collecting cases). The "collective wisdom of those cases" teaches that "the law [does] not impose an affirmative duty to disclose the FDA's interim feedback just because it would be of interest to investors." *Alkermes*, 523 F. Supp. 3d at 292 (quoting *Sanofi*, 87 F. Supp. 3d at 534). There is no duty to disclose as long as the FDA's commentary "does not express a binding agency decision and is subject to change as the FDA and pharmaceutical companies work together to develop viable clinical trials and approvable licensing applications." *Sanofi*, 87 F. Supp. 3d at 542.

There is likewise no basis for an inference of scienter unless and until the agency's position coalesces to the point that its statements to the applicant actually "contradict [the defendant's] public statements." *Id.* at 545. The putative inference of scienter—which must be "strong" to survive scrutiny under the PSLRA, 15 U.S.C. §78u-4(b)(2)—will be especially *weak* where the "gravity of the FDA's negative feedback" has been "muted by . . . encouraging regulatory decisions," such as a Fast-Track Designation and the acceptance of the defendant's application for review. *Sanofi*, 87 F. Supp. 3d at 545. Scienter, in other words, arises in this context only "where 'the management knows that certain facts will necessarily prevent regulatory approval . . . and

13

conceals those facts from the investing public.'" *Alkermes*, 523 F. Supp. 3d at 293 (quoting *Sanofi,* 87 F. Supp. 3d at 529).

    **A.**    **The FAC Does Not Allege That The FDA Expressed A Binding Agency Decision About The Composition Of The Analysis Population Before The Late Cycle Meeting.**

As the Court noted at the pre-motion conference, the FAC is perhaps most notable for what it does *not* say. Although the Plaintiffs' allegations were informed by the collective knowledge of no fewer than five former Spero employees—one of whom had full access to all regulatory submissions, ¶49, and one who "was brought 'into the tent'" about "what was happening "vis-à-vis the FDA," ¶52—the FAC says nothing about the contents of the FDA's interim feedback to Spero, and consequently fails to allege, in anything resembling direct terms, that the regulators ever expressed "a binding agency decision," *Sanofi*, 87 F. Supp. 3d at 542, or "that the information conveyed by the FDA was such that it demonstrates that Defendants did not honestly believe that their statements of optimism to the investing public were true." *Alkermes*, 523 F. Supp. 3d at 293. In that regard, the FAC is even more deficient than the complaints dismissed in *Sanofi* and *Alkermes*, which alleged the substance of the FDA's comments, and thus enabled the courts to compare (1) what the agency told the defendants with (2) what the defendants said (or did not say) to investors.

    **B.**    **The FAC Does Not Support A Strong Inference That The FDA Expressed A Binding Agency Decision To Spero Before The End Of The Class Period.**

Insofar as the Plaintiffs don't simply advocate an impermissible fraud-by-hindsight approach, *but see* Sylvia Decl., Ex. C, Transcript of Pre-Motion Conference at 3 (Plaintiffs' counsel beginning his presentation by saying, "So we know the outcome, right?"), *id.* at 21 ("Well, the FDA said more than that ultimately"), their theory of the case is that the Court can fill this gap by inference—specifically, by inferring that the FDA notified Spero that ADAPT-PO would not

14

support its NDA from the sheer *frequency* of the company's previous interactions with the agency: "it is clear that Defendants had unusually significant and frequent access to the FDA ***throughout*** the Class Period, and that the LCM in April 2022 was the ***last***—not the first—time that they delved into the ADAPT-PO Trial's patient population and non-inferiority margin data." ¶57; *see also* ¶¶170-173 (alleging that frequency of interactions is probative of scienter). The Plaintiffs would buttress the putative inference with a number of other circumstantial allegations: (1) that at least one CW was surprised by the level of FDA scrutiny and "felt it was weird that the FDA was asking all of those questions," ¶49, (3) that "Spero let CW1 quit in February 2022," ¶48, (4) that Spero's managers ostensibly kept the FDA interactions secret from employees in April 2022, ¶¶49-51 (though not from CW2 or CW5, ¶49), and (5) that the company laid off a substantial percentage of its workforce soon after the Late Cycle Meeting. ¶53.

None of this is nearly adequate to the considerable task of generating a strong inference of scienter. An inference of scienter is "strong" only if it is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Here, there are far more compelling "opposing" inferences to be drawn from the facts on which the Plaintiffs rely. First, the FAC itself explains that the frequency of Spero's interactions with the FDA was not a bug, but a feature of tebipenem's Fast Track Designation: when given Fast Track status, an NDA "moves . . . through the approval-seeking process at a much quicker pace than standard applications," and, "due to the speed, the FDA remains in much greater and frequent contact with applicants so they can keep the application moving quickly." ¶48. There was, consequently, nothing "weird" about the pace of Spero's discussions with the FDA, and no adverse inference to be drawn from it.

15

Second, the FAC likewise shows that there is nothing relevant to be inferred from the veil of secrecy Spero allegedly threw around its regulatory interactions in the last month of the Class Period. Both CW2 and CW5 were "inside the tent," and yet neither could report anything unusual or untoward in what the FDA was saying to Spero at the time.

Third, as the Court noted at the pre-motion conference, there is nothing objectively remarkable—and therefore no inferential value—in the allegation that Spero laid off a large portion of its workforce *after* the Late Cycle Meeting, and after the company had publicly disclosed that it was "immediately" suspending commercialization activities for tebipenem based on the feedback from that meeting: "I don't know if I knew after the late-cycle meeting that I couldn't pay anybody any more, I might move to lay them off quickly, as well." Sylvia Decl., Ex. C at 32.

Finally, the most compelling—and only plausible—inference to be drawn from the allegation that Spero "let CW2 quit in February 2022 . . . without any effort to keep" him or her, ¶48, is that Spero had no choice *but* to acquiesce. Nothing in the FAC suggests that CW2 wasn't an employee at will, nor does it say that CW2 was so indispensable that it would be "suspicious" if the company did not make an extraordinary effort to keep him or her.

The last nail in the FAC's coffin is the fact that, even if the Court were to indulge all of the Plaintiffs' inferential aspirations, they still would produce nothing more concrete than the proposition that, as the Plaintiffs themselves put it, the Late Cycle meeting was "not the first" time that Spero and the FDA had "delved" into the ADAPT-PO Trial's patient population and non-inferiority margin data. ¶57. Even if one accepts that allegation as well-pleaded, both the word "delved" and the phrase "not the first" will still leave two critical questions unanswered: What did the Defendants know, and when did they know it? *Miss. Pub. Employees Ret. Sys. v. Boston Sci.*

16

*Corp.*, 523 F.3d 75, 86 (1st Cir. 2008) ("Securities actions raise questions of what corporate managers knew and when they knew it").

**What Did The Plaintiffs Know?** Counsel for the Plaintiffs effectively answered the first question—and did so in a way that renders the FAC irremediably defective—when he admitted at the pre-motion conference that all of the circumstantial allegations about the FDA's interactions with Spero indicated nothing more than "an interim discussion about the ultimate issue" of ADAPT-PO's patient population. Sylvia Decl., Ex. C at 22. The FAC therefore falls short of what the law demands for a viable securities-fraud complaint based on FDA commentary, because as the Court has seen there is no duty to disclose "interim feedback" from the FDA, and no basis for an inference of scienter from the "failure" to disclose such feedback unless it either expresses a binding agency decision or contradicts the defendant's public statements.

This Court's recent decision in *Alkermes* is instructive. The defendants applied to the FDA for marketing approval of a drug (known as "ALKS 5461") designed to treat depression. 523 F. Supp. 3d at 287. The FDA granted the application "Fast Track" status. *Id.* at 287-88. Early on, Alkermes disclosed that it planned to use a particular testing method, known by the acronym "SPCD." *Id.* at 287. The FDA expressed some reservations about (but no categorical objections to) this methodology, *id.*, and when the time came to develop a Statistical Analysis Plan for the Phase 3 trial of the drug, it "reiterate[d] that we haven't endorsed any analytical method for SPCD in a confirmatory trial setting." *Id.* at 288.

After discovering that preliminary results indicated the Phase 3 trial would not meet its "prespecified" endpoint (which measured efficacy on the basis of a particular depression rating scale), Alkermes proposed to change the way in which the endpoint would be measured. *Id.* at 289. The FDA responded (1) that it generally did "not accept major changes, such as revising the

17

primary efficacy measures, in the late stage of a clinical trial," (2) that it had not previously accepted one of the rating scales that Alkermes now suggested as an alternative metric, and (3) that it did "not agree" with Alkermes' new methodology. *Id.* However, the agency did not categorically reject the proposal, and Alkermes did not disclose the FDA's reservations. The lawsuit commenced after Alkermes tried to file its NDA, and was compelled to announce that the FDA had issued a "Refusal to File" letter, and "has taken the position that it is unable to complete a substantive review of the regulatory package, based on insufficient evidence of overall effectiveness…." *Id.* at 290.

This Court dismissed the complaint on scienter grounds, ruling that the facts alleged failed to support the essential contention that Alkermes "was told 'with certainty, that the design of its clinical trials would necessarily prevent approval…." *Id.* at 294. Nothing in the complaint revealed "information conveyed to Alkermes that should reasonably have been interpreted to suggest that FDA approval of ALKS 5461 was not possible or even unlikely." *Id.* The putative inference of scienter, moreover, was "muted" by a series of "encouraging regulatory decisions," including the grant of Fast Track status, *id.* at 294-95, and undermined by the understanding that "implicit in the ongoing dialogue between the FDA and Alkermes was a collective expectation that the process was an iterative one and that Alkermes would continue to respond to feedback in its continued effort to seek approval of ALKS 5461." *Id.*

The FAC is at least as weak as the complaint that this Court dismissed in *Alkermes*. Even if one makes the inferential leap required to assume that the FDA had raised the composition of the micro-ITT population as an issue at some time during the Class Period, the FAC has a glaring deficiency: the Plaintiffs' admitted inability to allege that the FDA did anything more specific than "delve" into the issue, ¶57, or that the agency's feedback to Spero amounted to anything more than

18

"interim discussions" about that "ultimate issue." Sylvia Decl., Ex. C at 22. As in *Alkermes*, even if the FDA's commentary had conveyed any negativity, it would have been "muted by a series of encouraging regulatory decisions," 523 F. Supp. 3d at 295—not just Fast Track designation, ¶44(g), but also the designation of tebipenem as a "Qualified Infectious Disease Product," ¶39, the contract that Spero received from the U.S. Biomedical Advanced Research and Development Authority, ¶44(d), and the fact that the FDA did not issue a "Refusal to File" letter after it received Spero's NDA. *Cf. Alkermes*, 523 F. Supp. 3d at 290 (noting that "Alkermes announced it has received an RTF letter from the FDA"). Therefore, as in *Alkermes*, the far more compelling inference is that any feedback Spero received from the agency before the Late Cycle Meeting was part of an "ongoing dialogue" that embodied the "collective expectation that the process was an iterative one and that [Spero] would continue to respond to feedback in its continued effort to seek approval" of tebipenem," *id.* at 294, and that Spero had not been told, "with certainty," that the FDA had decided to exclude all gram-positive infections from the micro-ITT population—a decision that would have radically altered the micro-ITT population specified in both the study protocol and the SAP, and thus would have been at odds with the FDA's aversion to making "major changes, such as revising the primary efficacy measures, in the late stage of a clinical trial." *Alkermes*, 523 F. Supp. 3d at 289.

**When Did The Defendants Know It?** The FAC is equally defective in its failure to support the construction of a coherent timeline. Did the FDA "delve" into the patient-population issue before it designated tebipenem as a Qualified Infectious Disease Product in 2017? Before BARDA gave Spero a contract in 2018? Before the FDA accepted Spero's IND application (with its detailed description of the inclusion/exclusion criteria for the proposed micro-ITT population) in early 2019? Before the agency gave tebipenem Fast Track status later in 2019? Before or at the

19

pre-NDA meeting in 2021? Before the agency accepted the NDA for filing in early 2022? In any particular one (or combination) of Spero's "'multiple antecedent discussions with the FDA" before and during the Class Period? ¶6. The FAC not only fails to provide a date or event that might enable the Court to reckon the beginning of a legitimate class period, but fails to provide facts from which even a rough answer to the "when" question could be derived.

At the pre-motion conference, the Plaintiffs fell back to the position that the FDA must have notified Spero that its application for tebipenem was "dead in the water" by March 31, 2022, because on that day Spero disclosed in a press release (filed at the SEC in a Form 8-K) that the FDA had recently "identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time." ¶8. According to Plaintiffs' counsel: "our case gets much stronger once that deficiency notice is issued…." Sylvia Decl. Ex. C at 28; Sylvia Decl. Ex. D (Form 8-K).

Not so. The "deficiency notice" actually establishes that the notice did *not* convey a binding agency decision or contradict Spero's previous public statements, and that it therefore did not trigger a duty to disclose and will not support an inference of scienter. Although the FAC omits this information, ¶8, the press release told investors that "[t]he FDA stated that the notification ***does not reflect a final decision*** on the information under review," Sylvia Decl., Ex. E (emphasis added), and there is nothing in the FAC to suggest that this was an inaccurate rendering of the FDA's communication to Spero.[3]

---

[3] The Court can take judicial notice that according to the FDA's policies and procedures for issuing deficiency notices, the purpose of such a letter is to notify the applicant that previously-established target dates will not be met, *not* to communicate a final agency decision on the viability of the application. Sylvia Decl., Ex. F, FDA Center for Drug Evaluation and Research, Manual of Policies and Procedures, MAPP 6010.8 (2014) at 3 (letter will notify the applicant that deficiencies "preclude the discussion of labeling or PMRs/PMCs ***by the target date identified in the timeline***") (emphasis added).

Thus, even if the FDA had "delved" into the patient-population issue before it issued the "deficiency notice" in March 2022, the document itself informed Spero that the agency was not *currently* making the kind of "final decision" that would trigger a duty to disclose, and it follows from this statement that the FDA had not *previously* made such a decision. And, since the FAC does not allege that there were any relevant communications between the FDA and Spero between the date of the "deficiency notice" (late March) and the date of the Late Cycle Meeting (late April), it follows as well that the FDA did not convey a binding agency decision to Spero at *any time* during the putative Class Period.

The Court should note, moreover, that the FAC does not allege that any other events occurred between the end of March 2022 and the end of April 2022 that might support an inference of scienter. Spero did not raise any funds during that period, ¶¶186-189, nor did the Individual Defendants receive any extraordinary bonuses or stock grants, ¶¶181-185, or sell any of the stock they already owned. ¶¶176-180. If the so-called deficiency notice had told Spero in March that tebipenem was dead in the water, what point would there have been in continuing the charade through April? The FAC points out that when the bad news finally did materialize at the Late Cycle Meeting, Spero acted to mitigate its impact by laying off a large portion of the company's work force in short order. If the Defendants actually had known a month earlier that Spero's NDA would not be moving forward, why would they not have responded then—in the same way and with the same alacrity as they later did? The putative inference of scienter, when examined in this context, makes no sense.

C.     **The "Additional Facts Probative Of Scienter" Do Not, In Fact, Support An Inference of Culpability.**

What the Plaintiff advertises as "Additional Facts Probative of Scienter," ¶¶165-204, are anything but indicative of culpability. First, the only "red flags" identified in the FAC are (1) the

21

frequency of Spero's interactions with the FDA, *see* Section I.B. above, and (2) the notion that because Spero "opted to proceed with the ADAPT-PO Trial with an enrollment of 1,372 patients, despite the trial's being eligible for a maximum enrollment of 1,450," ¶168, "Defendants effectively self-selected the slenderness of their own margin for error within the ADAPT-PO Trial's patient population," exposing it to failure when the agency later "chose to exclude patients infected with gram-positive bacteria…." ¶169. But this is a fraud claim, not a mismanagement-of-clinical-trials complaint, and so even if it was true that Spero mistakenly under-enrolled the study, it would provide no basis for an inference that it did so knowing, or recklessly disregarding the risk, that the trial would fail when the FDA, at the eleventh hour, radically altered the composition of the micro-ITT population to exclude all gram-positive cases.

In any event, the under-enrollment allegations are not well-pleaded. The Plaintiffs criticize Spero for proceeding with 1,372 patients, "a number lower than the permissible maximum of 1,450 patients" recommended by an independent data review committee. ¶55. They rely on an article in the New England Journal of Medicine for the allegation that Spero disregarded the data review committee's recommendation, ¶127(b), but the article—which is attached as Exhibit -- and can be considered by the Court because of the Plaintiffs' reliance on it, *Bythewood*, 2022 U.S. Dist. LEXIS 180011, at *2, n.1—shows that this is not a viable allegation for two reasons. First, the data review committee actually recommended the "enrollment of approximately 1200 patients up to a maximum of 1450," meaning that, while Spero understandably avoided going over the "permissible" maximum, it actually exceeded the recommended population size by a considerable amount. Sylvia Decl., Ex. G at 1329. Second, the article makes clear that, insofar as Spero revised *any* aspects of the protocol, the changes were "owing to the coronavirus disease 2019 pandemic

22

and the resulting operational challenges," and that Spero acted "in consultation with the FDA…." Ex. G at 1329.

At least two of the "additional facts probative of scienter" consist entirely of boilerplate that, as a matter of law, will not generate the requisite inference. The "core operations" doctrine, ¶¶193-194, has not been approved by the Second Circuit in the post-PSLRA era, and in any event has no application here because "[t]he desire to have a drug application approved can be ascribed to any pharmaceutical company." *Fialkov v. Alcobra Ltd.*, 2016 U.S. Dist. LEXIS 42633, at *22 (S.D.N.Y. Mar. 30, 2016) (quoting *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 570 (S.D.N.Y. 2011)). Generic allegations about "suspicious compensation" consisting solely of an individual defendant's regular salary and bonus, ¶¶181-185, are likewise inadequate because "economic self-interest and other motives possessed by any corporate officer or director are insufficient to plead scienter for securities fraud." *Xerion Partners I LLC v. Resurgence Asset Mgmt.*, LLC, 474 F. Supp. 2d 505, 519 (S.D.N.Y. 2007).

The remaining "additional" scienter allegations share a common defect: They assume the conclusion that the Defendants knew about a binding agency decision or other information that contradicted their public statements *when* they took the actions that supposedly reflected their culpability. For example, the FAC alleges that scienter can be inferred from the fact that Spero raised funds during the Class Period, ¶¶186-189, but the allegations make clear that the fund-raising took place during the first week of the putative Class Period in September 2020. ¶187. Since, as the Court has seen, nothing in the FAC suggests that the FDA had—at the time—formed or expressed an intention to alter the composition of the micro-ITT population, there is no basis for an inference that the Defendants knowingly withheld this information from investors in order to protect the fund-raising effort. The same flaw scuppers (1) the allegations about Dr.

23

Mahadevia's stock sales, ¶¶176-180, the last of which took place on December 27, 2021, ¶177, just a few days before the FDA accepted Spero's NDA for review and granted it "Priority Review" status, ¶119 (and all of which were "made pursuant to a previously adopted Rule 10b5-1 trading plan," Sylvia Aff., Ex. H (Form 4 dated 12/29/21), and (2) the allegation that Spero reaped "unearned windfall government payments," ¶¶190-192, from the BARDA contract it had received way back in July 2018, ¶44(d), months before Spero had initiated the Phase 3 trial and thus before the FDA could have even contemplated the composition of the micro-ITT population, much less made and communicated a decision to exclude all gram-positive infections from the analysis.

## II.    The Court Should Dismiss The Section 20(a) Claim.

To state a claim for control person liability under Section 20(a) of the Exchange Act, a plaintiff must allege facts sufficient to show, among other things, "a primary violation by a controlled person…." *Bogulavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). Because, for reasons stated above, the FAC does not adequately allege a viable claim under Section 10(b), the Section 20(a) claims must be dismissed. *Alkermes*, 523 F. Supp. 3d at 295.

## CONCLUSION

The Court should dismiss the First Amended Complaint, in its entirety and with prejudice.

DATE:        March 31, 2023

Respectfully submitted,

John F. Sylvia, Esq.
**MINTZ, LEVIN, COHN, FERRIS
    GLOVSKY, AND POPEO, P.C.**
919 Third Avenue
New York, NY 10022
Tel:  (617) 542-6000
Fax:  (617) 542-2241
Email: JFSylvia@mintz.com

*Attorney for Defendants Spero Therapeutics,
Inc., Ankit Mahadevia and Satyavrat Shukla*

25