# EXHIBIT C

1

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
------------------------------x
                                      22-CV-3125(LDH)
IN RE:
                                  United States Courthouse
                                  Brooklyn, New York
      SPERO THERAPUTICS INC
      SECURITIES LITIGATION,
                                  February 22, 2023
                                  2:00 p.m.
------------------------------x

      TRANSCRIPT OF CIVIL CAUSE FOR PREMOTION CONFERENCE
          BEFORE THE HONORABLE LaSHANN DeARCY HALL
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES

Attorney for Plaintiffs: POMERANTZ LLP
                         600 Third Avenue, 20th Floor
                         New York, New York 10016
                         BY:  MATTHEW TRUCCILLO, ESQ.
                              JENNIFER BANNER SOBERS, ESQ.

Attorney for Defendant:  MINTZ, LEVIN, COHN, FERRIS, GLOVSKY &
                         POPEO, P.C.
                         One Financial Center
                         Boston, MA 02111
                         BY:  JOHN F. SYLVIA, ESQ.

Court Reporter:          AVERY N. ARMSTRONG, RPR
                         Phone:  718-613-2419
                         Fax:    718-613-2639
                         Email:  Aarm.edny@gmail.com

Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

PROCEEDING                          2

(In open court)

THE COURTROOM DEPUTY:  Good afternoon.

This is a civil cause for a pre-motion conference for in re: Spero Theraputics Inc. Securities Litigation.

Can counsel please state their appearance for the -- oh, docket number 22-CV-3125.

Can counsel please state their appearance for the record, starting with the plaintiff.

MR. TUCCILLO:  Good afternoon, Your Honor.

Matthew Tuccillo, Pomerantz LLP, for the plaintiffs.

THE COURT:  Good afternoon.

MS. SOBERS:  Good afternoon, Your Honor.

Jennifer Sobers at Pomerantz Law Firm for the plaintiffs.

THE COURT:  All right.  Good afternoon to you, as well.

MR. SILVIA:  Good afternoon, Your Honor.

Jack Sylvia from Mintz, for the defendants.

THE COURT:  All right.  Good afternoon.  You can be seated.

All right, folks.  So we are here for pre-motion conference in connection with the defendant's proposed motion to dismiss the securities class -- this putative securities class action complaint.  In their letter, the defendants have raised a number of bases upon which they would argue for

PROCEEDING                                3

dismissal of this case.  And the first argument that they make is that in essence, according to the defendants, the plaintiffs are arguing fraud by hindsight.  And so I have to tell you, in reading the complaint and reading the arguments that were fashioned by the parties, I am a bit perplexed, to be candid.

In terms of -- we talk about pre-March 30, 2022, I think March 30th is the date of 2022.  I'm trying to identify, in the complaint, the material misstatements or misleading statements that would provide the bases.  And I just want to do this in terms of the time period before March 30th.

And you can actually move closer this way because I'm going to require that you stand when you address the Court, so you might want to -- Cat, can you help them with the microphone, please?

THE COURTROOM DEPUTY:  Sure.

THE COURT:  There you go.  If that chair is in your way, you can just push it aside.

Yes.  So help me out here.  What should I be looking to to identify the bases for the assertion that there was some alleged misstatement prior to March 30th, 2022?

MR. TUCCILLO:  Thank you, Your Honor.

So we know the outcome, right?  We know that the clinical trial data was insufficient to support FDA approval and we know the reason for that was because the evaluable

patient population included the majority of patients infected with gram-negative bacteria, but it also included the minority of patients with gram-positive.  That was true throughout. Okay.

And I'll refer more than once to a case called DEL CAF because which I do think is on all fours here, because in that case, there were true statements about a phase three clinical trial.  The statements at issue in that case were unquestionably --

THE COURT:  I'm sorry.  Which case?

MR. TUCCILLO:  Sure.  It's in re: DEL CAF, and the citation is 36 --

THE COURT:  I have it in my binder.  Thank you.

MR. TUCCILLO:  So just -- let me pivot to that for just one second, and I'll get back to your question.

In that case, there were unquestionably true statements about phase three clinical trial results.  They were correctly reported mortality and significant adverse affects within the drug population of that trial.

What they omitted, okay, and the reason why those statements were withheld as materially misleading, they omitted the same contextual information for the control group. So the statements are unquestionably true.

In our case, we have statements that were, at best, materially misleading.

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

PROCEEDING                           5

THE COURT:  Which statement?  But what statement was materially misleading that you are alleging in this pre-March 30, 2022, timeframe?

MR. TUCCILLO:  Sure.  The statement that the trial met its endpoints, the statements that the trial data -- I'm paraphrasing because the same statements is repeated over and over and over throughout the period.  But the evaluable patient population, that the trial data was sufficient to permit FDA approval when it, in fact, was not.

THE COURT:  But do you have a statement -- do you have anything that you can direct the Court to that supports the last assertion that you made that, at that time, it was insufficient to meet the demands by the FDA?  If I looked to, for example, paragraph 49 of your complaint, right, your -- I think it's confidential witness number one, maybe it's number two, I don't know.  Two?  Thank you.

There's much discussion in that paragraph, and it's a lengthy paragraph about the quantity, the volume of discourse between the FDA and Spero.  However, what is at least conspicuously absent for me is any commentary with regard to the substance of those discussions such that the Court would be able to determine that those discussions somehow rendered the statements that were being made by the company misleading because they lacked the requisite context.

MR. TUCCILLO:  I think I understand your question.

PROCEEDING                                6

So CW5 and that paragraph is 52, I believe, said that the reason why it was ultimately disclosed that the FDA had rejected the inclusion of these gram-positive patients is because the drug that the -- the trial drug was being compared to, which is IV or intravenous ertapenem was not indicated to treat gram-positive bacteria.  That was the FDA's ultimate reason for rejecting --

THE COURT:  Right.  But my question to you is, before we have a deficiency notice and whatever inferences the Court might need to draw as to what the contents of that deficiency notice was, is there anything that you can point to in terms of information that was provided or statements made by the FDA, provided to the company, that would suggest that there was some deficiencies that the company should have known of, in this -- prior to March 30, 2022, that would make their representations concerning the efficacy of the study to be able to make the ultimate conclusions that they made accurate or inaccurate, right?

So we're talking about the inclusion of certain patients.  Ultimately, the FDA said, we're not going to include those patients.  Once you exclude those patients, you don't get to the conclusions that the company had previously drawn.

Is that, like, in layman's terms?  Did I kind of get it?

MR. TUCCILLO:  I understand exactly what you're asking.  And I'll try my best -- I know what you're saying, and I know how I want to answer it, and I'll try my best to do it.

The two facts that were known throughout, right -- so you're saying, March, they actually get a letter saying, hey, this is not going to pass mustard, like, spelling it out in plain English, right?  Prior to that, we don't know, right?  They're talking to the FDA as early as December of 2021.  But here's what they knew the entire time:  They knew two things the entire time.  They knew that the comparison drug was not indicated to treat this type of bacterial infection, and they knew that they under enrolled the study.

THE COURT:  Well, when you say, under enrolled the study -- and we'll get to the first part -- as I read it, they did not take advantage of, as you've pleaded it, the maximum number of participants that was allowed?

MR. TUCCILLO:  Correct.  And moreover, despite --

THE COURT:  But does that mean it's under enrolled?

In my head, if you say there's a maximum, was there a minimum?  Because under enrolled would suggest it was below the threshold of the minimum?

MR. TUCCILLO:  Let me use under enrolled as a lay term.

THE COURT:  And the court reporter is going to say

to you, in a minute, that the judge is talking, you are not talking because I can't get the both of you down at the same time, and the judge wins.

MR. TUCCILLO:  Pardon me.

THE COURT:  Thank you.  Go ahead.

MR. TUCCILLO:  Okay.  Under enrolled, let's call it, a lay term that I'm using.  It was obviously permissibly enrolled or it wouldn't have even started.  But when 70 percent, only 70 percent, of the response data had come in, and before the trial population was locked, okay, there's a data review committee that takes a blinded review of that data and then advises the company.  That data review committee said, you should increase enrollment in order to ensure that you will have a patient population that will allow you to measure your endpoint.  They were literally told this.

THE COURT:  I mean, this is an aside.  I don't know if it has any legal import, but I am curious.  If they had maxed out and if they excluded ultimately the germ positive -- did I get that right, germ positive?  Gram, not germ, okay. Gram-positive folks.  I'm just curious.

Would it have made the difference that you're suggesting, or doesn't it not -- if you do the numbers, doesn't it actually not remedy the problem because you're saying they didn't max out?  I'm just curious.

MR. TUCCILLO:  The best answer I could give you is

that that mathematics might be slightly scientifically above my pay grade.  But I'll note that their letter didn't say that it was so.

THE COURT:  Okay.  Anyway.  So but you're saying --

MR. TUCCILLO:  But that's the defense, right?

THE COURT:  So they had a recommendation, they didn't use the maximum, but they weren't required to use the maximum.  Obviously, the maximum was what they were permitted to go up to.  Okay.  So they didn't use the maximum, though there was a recommendation, not by the FDA, that they do so.  And the information and who made up the trial, et cetera, was information that was provided to the FDA all along, right?

You're not suggesting that Spero somehow did not disclose to the FDA or investors, et cetera, how the trial was operating in terms of who made up the clinical trial, the 13 whatever, the 1300 individuals?

MR. TUCCILLO:  I understand the question.  I think the omission, the reason the misstatements are misleading is the failure of the company to explicitly state that the failure to fully enroll, let's say, the trial, coupled with our decision to include the gram-positive infected patients --

THE COURT:  Had the FDA objected up until this point, that you can identify, in communication to the company that would have allowed the company to understand that when they made representations concerning the trial, that indeed,

their representations were somehow wrong?

What is it am I measuring this against?

I understand what you're saying was always the case with the trial, that they never reached the maximum number that they could have and that that trial included a patient population -- I keep saying "germ," it's not germ.  Gram?  Gram-positive population in the trial.

Is there any communication or information that the company would have received in the numerous -- because your complaint does make plain that there was a lot of back and forth with the FDA, and there was a lot of back and forth with the FDA, according to your complaint, by people with knowledge of what was in those communications.  Yet and still, there's nothing in the complaint that I can identify that these confidential witnesses have included that suggested that the FDA had communicated to the company, in sum or in substance, something that would suggest that the trials had been rejected in terms of the manner in which they were being conducted up until that point.

MR. TUCCILLO:  So we're having a falsity discussion.  But the law here makes clear that falsity and scienter overlap, and we're kind of talking about both.  *Tellabs*, the Supreme Court decision disavowed the need for such smoking-gun-level evidence.  If I had that, we wouldn't be having this conversation --

THE COURT:  I'm just want anything.  I want something.

MR. TUCCILLO:  No, I understand.

THE COURT:  I'm not saying -- it doesn't have to be a smoking gun.  I actually started this by saying, tell me, what do I have?

MR. TUCCILLO:  The best I have is this:  My read and Your Honor obviously is free to differ --

THE COURT:  That's fine.

MR. TUCCILLO:  My read of the DEL CAF case is that it is squarely on fours with us.  Technically true statements were rendered misleading by failure to say things about the control group in that study.  Here, technically -- I don't even think they were true, by the way --

THE COURT:  But there had to have been more -- forgive me.  This is my own failure, because I haven't read the DEL CAF case closely, although my clerk did put it in front of me.  But there had to have been more than just simply, they didn't disclose it.  There had to have been something about the trials, et cetera, that would make that disclosure a necessity.  And that's what you're not giving me here.  And that's what you're not -- you're not telling me what that was in the DEL CAF case as you're not telling me what that would be here.

MR. TUCCILLO:  So I think Your Honor is speaking to

PROCEEDING                                    12

the duty to speak, which the DEL CAF explains and I'll parrot which is that once you choose to speak about a topic, you're under an obligation to speak -- the information that's necessary to make the statements made in the light in which they are made not misleading.  If the company is saying over and over and over, we've met our endpoint, the data will support FDA approval when, in fact, there's a glaring vulnerability --

THE COURT:  But how do we know it's a glaring vulnerability is what I'm trying to understand?  You want me to assume that there's this glaring vulnerability, and I was looking for some information that the company would have received to suggest to it, even, that that's a glaring vulnerability, as opposed to where you started, which was, we know that, ultimately, at the end of the day, it ended up not getting approved because of the population of this test was insufficient to meet the demands of the FDA.

But doesn't that then bring us back to where the defendants started this in terms of hind sight?  No.

MR. TUCCILLO:  I don't think so because a traditional fraud by hindsight --

I'll wait until Your Honor finishes reading your note.

THE COURT:  No, I can hear you too.  I've been listening to you.

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

Case 1:22-cv-03125-LDH-MMH    Document 35-3    Filed 06/21/23    Page 14 of 39 PageID #: 676

PROCEEDING                              13

MR. TUCCILLO:  A traditional fraud by hindsight is where some event might occur later that could not have been known, and because of that event, you go back in time --

THE COURT:  Right.  And, here, is that the FDA had a problem with the makeup of that trial.

MR. TUCCILLO:  So what we know is, we know that the reason they rejected it, the inclusion of these patients within the days, we know that that was known from the get-go. We know that the flaw --

THE COURT:  Wait.  I'm sorry.  Can you repeat that?

MR. TUCCILLO:  The trial did not derail, for example, due to some COVID impact that arose two years later. It was -- the data was rejected, ultimately.  It was deemed insufficient to proceed with, ultimately, because the patient population included a certain type of infected patient.  That was known, as was the fact that the comparison drug was not indicated to treat that.  In fact, the underlying --

THE COURT:  But that was all known to the FDA up until this point.  And did the FDA say anything to suggest that -- until it was ultimately problematic -- and the word "ultimately," I think, is fair -- until it was ultimately deemed problematic as of March or -- ultimately, I don't know exactly what the March 30th notice said.

But is there anything to suggest that, in the interim period, that there was some basis to believe that

*OFFICIAL COURT REPORTER*

those were as problematic as we ultimately thought that they were?

MR. TUCCILLO:  What we have are some strong inferences, right?  We have the fact that this was on a fast-track designation which is unusually frequent, unusually accelerated on a rolling basis.  We have confidential witnesses saying, we are getting way more questions than normal and about clinical data, by the way.

THE COURT:  But what question -- I mean, the whole -- it's an iterative process.  And, yes, it may be in their experience, there's not as much communication, but there's no substance to what you're -- all I know is that they were talking a lot.

MR. TUCCILLO:  I think it's an inference because I think if CW2 -- forgive me, I may get the number wrong.  But one of the higher-placed CWs working with not only the data, but the packaging of the responses to the FDA said, I was unnerved by this.  This made my think that the NDA was shaky that we were getting asked so many questions in such an intent way.

The inference is not they were asking about some other totally unrelated thing and then six months later, they rejected the data because of the inclusion of these patients, right?  I mean, the logical inference, the reasonable inference is they were asking about the make up of the test

all along.  It would be out of left field to have been grilling the company about this one concern, and then at the end, reject the data about some totally unrelated concern.

THE COURT:  Well, I don't know exactly, specifically what all the inquiries were about, at least -- doesn't seem to be abundantly clear to me.  I know that there was a lot of them.

MR. TUCCILLO:  The problem is we don't either.

THE COURT:  But you have a confidential witness who's speaking about the communications that saw them.  I was surprised that there was no mention of what they were.

MR. TUCCILLO:  The information that we were able to obtain and that we included was that the inquiries covered clinical information, clinical data, among other topics, right?  So that's the best we were able to do at this stage.

THE COURT:  I don't know if you get to the inference that you're saying is a logical inference as opposed to perhaps a leap.  But I haven't had the -- let the defendant speak.

MR. TUCCILLO:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. SILVIA:  Thank you, Your Honor.  I might start, right, with what is the logical inference?  One piece that's being left out here in the FDA drug development process is the FDA reviews a protocol from -- at the start.  They understand

what the end points are, what the company is trying to prove, what the patient population is.  There's no suggestion in this complaint that FDA ever rendered any complaint about it.  And of course, FDA doesn't approve your protocols.  They let you go until they tell you to stop.  And they never told the company to stop.

And you get to the end of it, you start with the protocol, they accept the new drug application.  That's filed in the fall of 2021.  It's accepted in January of 2022, two months before the company's first disclosure where they get the deficiency letter and then another two months after they have --

THE COURT:  Give me those dates again.

MR. SILVIA:  I believe it's January 3rd, Your Honor, for accepting the NDA, which was filed, I want to say -- yes.  So it's at paragraph 119 on January 3rd, 2022.  The company issues press release.  And, in that press release, it announced, FDA granted priority review designation and confirmed the acceptance for substantive review of the new drug application.

Not surprisingly, once the new drug application is accepted, FDA starts asking for a lot of information.  They're now evaluating whether they are going to approve the drug.  We get two months later from January, and the company disclosed a deficiency letter.  And the reason that it was disclosed, it

basically said that they were not going to be able to have labeling discussions. And that was the first instance. And then the second part of it is they have a late-cycle meeting. And it's after that late-cycle meeting at the end of April that the company comes out and says, given feedback from FDA, at this meeting, we have decided we are going to change course.

So the logical inference is the FDA at the late-cycle meeting indicated that it was unlikely the drug was going to get approved. Pardon me, Your Honor.

One of the things that the -- I find interesting about all of the confidential witnesses, they all say they were surprised. Everybody at the company was surprised. That's the logical inference. The company has an NDA that's approved -- that's accepted. They're looking and working towards approval. They -- first information that is negative that the company promptly discloses which is the deficiency letter, and then right after the late-cycle meeting, given the feedback they got from the FDA, they disclosed that.

There's no allegation that any of that information was known to anybody at the company. There's no allegation that FDA had provided any criticism regarding the gram-positive patient population. There's nothing in the complaint about -- which is why I get back to, I think it is a classic case of fraud by hindsight. And if you can't identify

the false statement, why a statement was false when made, you don't even get to scienter, but we also sort of addressed that.

THE COURT:  So it seems to me -- and I could be -- you'll tell me if I'm wrong; I'm inviting you to.  But they're saying, it wasn't false.  We can't identify a false statement that was made prior to the issuance of the deficiency letter, but, rather, that the statements concerning the ability to reach the NI margin -- and I might be screwing this up, but you all will let me know -- is misleading because the company was aware that the population that made up this trial was somehow deficient for the purposes of approval.  I mean, I think that's the --

Plaintiff, did I get your theory right?  Did I get that right?

MR. TUCCILLO:  Thank you, Your Honor.  That's largely correct.

It's that there's, at minimum, right, at minimum, the common ground is that it was at least material and misleading --

THE COURT:  Well, you haven't identified a false statement.  So I haven't seen any -- I think I'm being generous to direct the plaintiffs to the notion of it being misleading.

So can you respond to the plaintiff's argument, as I

PROCEEDING                          19

understood it?

MR. SILVIA:  Yes, Your Honor.

I mean, again, going back to the protocol, the protocol defined these end points.  It defined the patient population, including gram-positive calculation that was included.  What the plaintiff is asking the Court to infer without any factual support is that there was any debate that that population could not be included in the trial and the results of the trial.  The trial is a success.  The company announced the results of the trial.  It met its primary endpoint, it was a pivotal trial.  If they had not been successful, it couldn't have filed the NDA.  The FDA would have had a refusal to file.

So, again, the logical information is that after the review process after FDA -- after acceptance of the NDA, the FDA started rasing some issues.  And the ultimate issue that changed the course of action for the company, after spending years developing this drug, was feedback at the late-cycle meeting.  And the company did what one expects companies to do, they promptly disclosed it.

THE COURT:  All right.  With respect to the false or misleading statements after the deficiency notice, I'd look to the 8K which I believe is where the plaintiffs were directing the Court vis-à-vis the complaint.  And I'm here, again, a bit perplexed as to what provides the bases for the contention

that statements made in view of the deficiency notice were false or misleading.

The 8K, on March 30th, I'm trying to define this, for example, in the complaint, the plaintiff's only -- quote, kind of truncated and spliced version of what was stated in the 8K. But the full sentence, as quoted by the plaintiffs in the complaint, the company says, We're focused on doing everything we can to address the deficiences. And given how early, in the review period, the labeling discussions were originally scheduled, we believe there would be sufficient time to progress to labeling discussions within the existing PDUFA timeframe. However, we do not know yet the affect of this notification, if any, on our anticipated timelines or on the ultimate approval process.

That's an example of what was said by the company in the wake of the deficiency notice. And it was the statement that you all included, though, only partially in the complaint. I am struggling to identify the problem with the statement, as it was actually included, in the 8K.

MR. TUCCILLO: Thank you, Your Honor. So the pivot point, I guess, is when there's an actual notice which you know, was lacking in the period prior to what we discussed. At that point, you know, the FDA has obviously indicated to the company that there's a problem. We know what the problem is, ultimately. It's incurable, right? I mean, you can't

PROCEEDING                    21

enroll new patients lickety split and get them to a clinical

phase three result in three months.  You're not going to be

able to, apparently, talk FDA out of the exclusion of these

patients and what we know in the interim is --

THE COURT:  Well, you say apparently, is that

apparent?  I mean, I don't know -- why is that so apparent?

Because -- forgive me.

But in terms of the end results, et cetera, there

was at least, in one space, it wasn't the FDA, where the trial

was used -- the trial was recognized as sufficient to be able

to get to this NI margin with the population that it included.

Ultimately, the FDA said that's not what we would

prefer.  But I'm trying to understand, how do I get to, it's

apparent that there would be no path to proceeding with the

population as it was?

MR. TUCCILLO:  Well, the FDA said more than that

ultimately.  The FDA rejected the inclusion of --

THE COURT:  Right.  But in terms of what was known,

you said it was apparent to the company that there would be no

way to get the FDA to change its position, that you can't

include this particular population of patients in the trial.

Was that -- and I was just honing in on your word "apparent."

MR. TUCCILLO:  To answer it differently, I don't see

any SEC filing or public disclosure that says, a percentage of

the patient population has been rejected by FDA -- or FDA has

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

indicated that it will reject.  We cannot enroll patients quickly enough to make up the difference, and our only path forward is to talk the FDA out of this action in the next two months.  Two months that correlate, by the way --

THE COURT:  Because you're saying that at the time that they made these utterances in this 8K that they knew at that moment, right, before the FDA said it was dead in the water, and this is -- you would agree that this is an interim discussion at least the deficiency notice because it was subsequent to the deficiency notice that the NDA made it a final decision.

So would you say that I can fairly describe this as an interim discussion?

MR. TUCCILLO:  I think you can fairly describe it as an interim discussion about the ultimate issue.  I don't think we're in the grey-zone anymore about what the FDA is concerned about where, perhaps, a year prior, that argument could be made.  I think now that we are two months --

THE COURT:  But this is an interim discussion.

MR. TUCCILLO:  About the ultimate problem.

THE COURT:  Oh, okay.  And so, I'm trying to -- because there is case law, as I'm certain you're aware, about a duty to disclose interim discussions.  And I'm trying to understand if you're suggesting that there was something about these interim discussions that would make it such that the

PROCEEDING                23

Court needs to view these statements as somehow misleading or having triggered a duty to disclose that wouldn't otherwise exist?

MR. TUCCILLO:  But, again, all of that case law, paraphrasing, talks to when there's otherwise not a duty to say anything where you're not speaking at all to the market. You're just silent.  And while we would all love to know -- and, in fact, if the law was contrary, I'd know what they were talking about a year prior, and we wouldn't have had the conversation we've had today.

So when you're just silent and you're doing that back and forth that we're talking about a year prior, if they're not saying anything -- I mean, I would argue they were, but if they're not saying a word that's on point, they don't have to disclose the content of those interim conversations, I would agree.

Once you choose to speak, that's what the DEL CAF and cases like it, say.  Once you choose to speak, you have an obligation, at that point, you've now created for yourself the duty, to give a fulsome presentation of the facts to render what you've said, not misleading.  And, again, we're talking about misleading people.  Misleading people as to the odds of something, misleading people to the severity of the problem.

The point I'm trying to make is, this correlates with the CWs.  Yes, they admitted surprise, but they admitted

surprise because they were kept into the dark as to what was going on. During -- multiple CWs said I was fired before I had any idea what had happened. One CW said I was one of the few people allowed access to clinical data. They locked it down in this interim period. They boxed people out from seeing it in the company. So there's extreme secrecy within the company as to what is even going on, right?

Those are not the actions of a company that is enthusiastic and confident about being able to overcome a hiccup. That's the actions of a company that is now trying to figure out, well, how are we going to get out of the mess we've created for ourselves? This correlates to the insider trading, et cetera, all the other allegations that we have buttressing scienter.

So I would say, at this point once we cross that letter threshold, the case is stronger for the reasons that we're describing now. They've been notified. The conversation is clearly about the ultimate problem. There is no way to fix that ultimate problem except to talk FDA out of the position they've articulated. You can't reenroll patients. You can't now get up to the max you should have done two years prior.

It takes more than two months to get a patient through a phase three clinical trial to the point where you generate data. It just wasn't possible to do it in that

timeframe.  You are now left with -- the only option left is to convince FDA they are wrong.  And if you're saying anything publicly about what is going on about what this letter is, you have an obligation, at that point, to disclose this sort of color.  That's exactly what the DEL CAF case was about those statements were all true.  Everything in it was unquestionably true.  They just had omitted the context of the comparison drug in that case.  So they said, yes, we reported our deaths and our significant adverse effects in our drug.  But they omitted to say, by the way, that the comparison drug had none.  So that gives you the context of whether what you're saying that's truthful is severe, is not severe, points toward likely approval, against it, because you're omitting that context that's necessary to say now that you've chosen to say --

THE COURT:  And the context, in this case, is the inference that the deficiency notice told the company, look, you have to -- we will not accept this trial -- this data if it is based upon this certain category of patients that have been enrolled.  You would need to have patients that didn't fall into that category to make up the difference, in effect?

MR. TUCCILLO:  I cannot fathom what that notice could have been covering.  But the problem that, two months later, kills the whole program.  It had to be about -- I mean, at this point, we are -- on much more solid ground, I'll concede, then we were 18 months prior, right?

THE COURT:  But am I right that in order to accept your theory, I would have to infer that that's what the deficiency notice said?  It would have to be that strong.

MR. TUCCILLO:  It's not just the deficiency notice.  In the December-to-February timeframe they're doing multiple times a week in the lead-up to this notice --

THE COURT:  But I don't know what any of that -- you haven't told me what any of that says.

MR. TUCCILLO:  I understand Your Honor's concern.  To my mind, in late February, if you're talking with the FDA twice a week and they're asking about clinical data, hard questions that are making high-placed CWs question whether the NDA is shaky, it's not about anything other than -- two weeks later you get a notice about.

THE COURT:  Right.  But they could have been asking questions and ultimately have been satisfied that they didn't need to exclude that population of patients.  I mean, you're just telling me that there was a frequency of inquiry.  And let's assume that it was even about whether or not you could include this population of patients in the data.  They could have.  And you haven't identified a statement or anything to suggest that that wasn't -- I couldn't equally infer that that could have been the outcome.  I mean, it ultimately wasn't, but that's not the way it operates, such that, in this interim period, the company can be said to have known that any

statements where they are suggesting, look, we can still move forward, this is still possible, were somehow true or misleading.

There's no context. I keep looking for the something that I'm supposed to, you know, view the statements or the omissions against, and that's what's missing for me.

MR. TUCCILLO: Right. And I apologize, Your Honor. You asked me multiple times about specific statements. It's a reasonable question. There are a couple of statements, less frequent than the ones about the sanctity of the trial data and the ability to move forward. There are a couple of statements about gram-positive patients specifically. I'm just having difficulty finding the paragraph numbers. With Your Honor's indulgence, I could put in something after the hearing --

THE COURT: No. You guys are going to brief this anyway. So that's when you'll do it.

MR. TUCCILLO: There were some statements about the ability to treat -- gram-positive statements specifically. Off the top of my head, I seem to recall him saying it at a conference. It was that sort of statement.

THE COURT: All right. No worries. The pre-motion conference for me is so that, one, I can hear from you all, and it helps me when I'm looking at the papers, but hopefully, also, it suggests to you all where you might want to make sure

PROCEEDING                          28

you concentrate your papers because it should reveal some of my own concerns.

So if I could ask the defendant, as I understand the plaintiff's argument, they're like, look, without conceding, the prior -- anything with respect to -- prior to the deficiency notice, but our case gets much stronger once that deficiency notice is issued because there's something -- I'm struggling a little bit, but -- because there's something there that makes it such that, in the absence of additional information, you're now misleading investors.

MR. SILVIA:  And my response to that, Your Honor, again would be, what are logical inferences versus leaps?  The suggestion that the company would go out, disclose the receipt of a deficiency notice -- and we're not even -- it's less than two months, we're like a little over a month, they have a the late-cycle meeting, and they disclose, we are now discontinuing the development of this drug.

We're laying off 75 percent of our work force.  Why on earth if that -- because of what FDA told them, why on earth, if FDA had told them a month or five weeks earlier, what would be the point?  Nobody sold any stock in that five-week window.  The company didn't raise money.  You're laying off, obviously, 75 percent of your workforce, the logical inference is something changed dramatically at that late-cycle meeting.  That doesn't make the disclosure of the

deficiency letter -- and we're still working and talking with FDA five weeks earlier -- false or misleading.

That's what's missing. And that's the position I get back to why we started with this as a classic fraud by hindsight case. It's clear that something changed that was dramatic enough that the company changed its course dramatically. And that is -- and it's spelled out in the company's disclosure as a result of meeting with the FDA at our late-cycle meeting. Sometimes it's Occam's razor. It's the logical --

THE COURT: When was the late-cycle meeting and when was the notice of deficiency?

MR. SILVIA: The notice of deficiency was in -- I apologize of the date. March 31 where they had the earnings call with the analysts. That's where the disclosure is. And then the late-cycle meeting -- and I apologize. I may be off by a day. I think it was the 29th of April, and they made the disclosure after the weekend.

THE COURT: So about a month?

MR. SILVIA: Yeah. About four or five weeks. So, to me, the logic of making such a dramatic change to the company, there had to be something different for that one month.

THE COURT: Right. And just out of curiosity, you allege -- insider trading, et cetera, does it happen in that

time period which would be from the date of the notice of

deficiency and the late-cycle meeting with the FDA?  I believe

that it had to do with bonuses and -- that were paid out in

July, but that was July of the previous year?  Am I correct?

So, you know, when does all this financial impropriety,

alleged impropriety occur?

MR. TUCCILLO:  Thank you, Your Honor.

I believe that it is prior, but I do have a

substantive response that addresses that comment that isn't

the insider trading.

With respect, I think that the presentation about,

well, the only logical thing that could have occurred is that

they changed course because what happened in the late-cycle

meeting.  That is counter to the allegations which have to be

accepted as true.

For example, CW1, who is the director of clinical

data management at Spero, okay, this is not a low-level

employee, this is a very high level employee.  Paragraph 48 --

THE COURT:  Is that his title?

MR. TUCCILLO:  Yes.

THE COURT:  Not so confidential then, is it?

MR. TUCCILLO:  That's how these things go.  But if

we don't say the title, we -- 100 percent.  100 percent.

Statutory bar against discovery.  I mean, what I do is

remarkably simple, isn't it?

THE COURT:  Okay.  I'm sorry.

MR. TUCCILLO:  But paragraph 48 says that CW1 quit in February 2022, before the deficiency letter and commented that it was remarkable that Spero made no effort at all to retain CW1, right?  Just let CW1 leave, right?  The director of clinical data management.

CW5, I believe it is, who's a medical liaison said that Spero did the mass layoff of employees that followed the late-cycle meeting -- late-cycle meeting was on a Thursday.  By Tuesday, 75 percent of the workforce were gone and severance checks had already been processed into their bank accounts.  And CW5 said -- I'm sorry, 6, I misspoke.

And CW6 said, that's remarkable because an undertaking of that effort would have taken extensive amount of time to plan, coordinate, get the HR sign-offs, the payroll, et cetera.  That's just stunning that it was basically over a weekend that that sort of layoff was done.  The conclusion that the fired employee drew was that that had been under preparations for quite some time.  Now, is it, you know, two months?  I'm not 100 percent sure.  But it's not five days.

THE COURT:  But I don't know if I can draw that as an inference.  You see what I'm saying because there's a difference between speculation and an inference, and --

MR. TUCCILLO:  Well, this isn't me arguing the

point.  This is what the employee at the company said.

THE COURT:  But the employee is speculating.  I mean, the employee doesn't -- there's no fact that the employee can -- they just think it's remarkable in their own mind.  I mean, I don't know if I knew after the late-cycle meeting that I couldn't pay anybody anymore, I might move quickly to lay them off, as well.

MR. TUCCILLO:  They had raised $85 million during our period which is one of the many things that we say was untoward.

THE COURT:  That they -- wait.  It's untoward that they what?

MR. TUCCILLO:  Among the financial motivations to commit fraud is the raise of $85 million during our class period by the company.  There was an offering done during the class period.  But I think --

THE COURT:  Should they not have been rasing money?  That's -- I mean, forgive me.  But rasing money all by itself is nefarious if you believe that you have a drug that is going to get approved, isn't it logical that you would be rasing money on the potential success of that drug?

MR. TUCCILLO:  Your Honor, used the word "believe."  That gets us into the case law of OmniCare, right?  So just because you believe something or you use the word "believe" at the beginning of all your sentences, that doesn't mean that

it's inactionable.

THE COURT:  But I wasn't talking about believe in that context.  I'm trying to understand why the rasing of capital -- the Court should view the fact that they raised capital, in this two-year time period, for a drug that they were pursuing ADA approval is nefarious in and of itself.

MR. TUCCILLO:  It's not in and of itself nefarious, but if the capital raises during an alleged period of fraud, if the fraud is validated, that is corroborating evidence of scienter --

THE COURT:  But you haven't identified for me -- I mean, if we just take the post-March 30th, 2022 period, which you say your case is stronger, your case is really, really weak before that -- sorry, that was a little much.  Sorry.

But if we assume that I think it was weak, they were rasing money during the period where I don't see any -- and again, I'm not deciding this decision -- this case in this hearing.  But I haven't been able to discern for myself, in this period leading up to the deficiency notice, putting aside for a moment, the defendants have arguments that they used to counter it.

But I don't see anything leading up to this deficiency notice such that I could say, look, they were engaged, as you said, in fraud during this time, but they were raising money.  Because you haven't pointed me to anything

PROCEEDING                                           34

that I could use as a basis to conclude fraud.

MR. TUCCILLO:  I would be remiss to not good-naturedly respond to the case being weak.  I do think that at best it could be said that the pleadings, right, are weaker because the case, for all we know, could be ironclad.  We don't know --

THE COURT:  But all I have are your pleadings.

MR. TUCCILLO:  We don't know that -- because of the discovery bar, we don't know the exact contents of those things.  But what I will note is, I'm not hearing an offer of a sworn affidavit by the CEO and a sworn affidavit by the CFO.

THE COURT:  I wouldn't do that either.  They don't have to.

MR. TUCCILLO:  100 percent.

THE COURT:  Congress said they don't have to.

MR. TUCCILLO:  I got you.  I agree with you.  And we are where we are.  But the case, for all we know, could be equally strong, but --

THE COURT:  Just so that we're clear, I measure cases on a motion to dismiss, the strength of the case, I measure it by the pleadings.  That's the only thing I can measure it by.  So based on these pleadings, right now, you have an uphill battle to climb particularly for this earlier time period.  Whether the climb is as steep post March 30, 2022, I don't know.  That it's very steep pre-March 30, 2022,

I can tell you that for certain.

MR. TUCCILLO:  Understood.

THE COURT:  Fair enough?

All right.  Let's talk about a briefing schedule -- oh, you wanted to say something else?

MR. SILVIA:  No.  I think we're probably at the point of getting into the briefs unless Your Honor has questions.

THE COURT:  No.  I've gotten what I needed.  Believe it or not, this was particularly helpful.  And you know where I'm going to want you to flesh things out.  I've highlighted it for you.  So, you know, give me what I need and then I can give you what you want.  But that's the -- we'll see.

So this is a securities case.  I normally have two weeks after, it doesn't need to be two weeks on this one. Tell me what you want.

MR. SILVIA:  So at the request of my team who works with me, Your Honor, if we could have until the end of March for our opening briefs.  So what is that, five weeks, I guess. And whatever counsel would like from there.

MR. TUCCILLO:  We would take the end of May which includes, by the way, spring break, et cetera.  There's some family travel.

THE COURT:  Did you guys talk about these dates?

MR. SILVIA:  We said - obviously if the Court would

agree --

MR. TUCCILLO:  Yeah.  We had a lovely conversation in the hallway prior to this.

THE COURT:  Give me the dates exactly that you guys worked out.

MR. SILVIA:  I will just say -- I don't know what day of the week March 31 is.

THE COURTROOM DEPUTY:  It's actually a Friday.

THE COURT:  Look at that.

MR. SILVIA:  So 3/31.

THE COURT:  You go back and you tell your team that you fought hard for them, tooth and nail.  The judge didn't want to give you March 30th, and you fought for them because you look out for your team.

MR. SILVIA:  I will be doing that.

THE COURT:  Okay.  March 31st, is that what we said?

MR. SILVIA:  Yes, Your Honor.

MR. TUCCILLO:  We'll just take May 31st.

THE COURT:  May 31st, everybody's happy?

MR. SILVIA:  That's fine.

THE COURT:  Okay.  Reply?

MR. SILVIA:  So what is that?  Pardon me, May 31st, what day of the week?

THE COURTROOM DEPUTY:  A Wednesday.

MR. SILVIA:  Three weeks?

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

THE COURT:  Three weeks?

MR. TUCCILLO:  He can have as long as he likes.  I don't have an oar in the water after May 31st.

THE COURT:  What is that?

THE COURTROOM DEPUTY:  June 21st.

THE COURT:  Okay.  Works for me.  June 21st.  You said it includes spring break?

MR. TUCCILLO:  Our 60 days does have some family travel.  Maybe 60 days is generous enough.  It's fine.  But if Your Honor was thinking --

THE COURT:  Yeah, but what's spring break?

MR. TUCCILLO:  Ours is in April.

THE COURT:  Oh, right, right, right.  Public school.  Your kids are out of school now?

MR. TUCCILLO:  No, they're in school.

THE COURT:  Oh.

MR. TUCCILLO:  I don't live in New York, I live in Connecticut.

THE COURT:  Oh, interloper.

MR. TUCCILLO:  If that's the worst thing I'm called today, I'll take it.

THE COURT:  All right.  Forgive me.

MR. SILVIA:  I'm just keeping my mouth shut because I'm from Boston.

THE COURT:  Oh, you're from Boston.  Oh, well, I'm

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

PROCEEDING                    38

partial to Massachusetts.  Martha's Vineyard is a lovely, lovely place.

MR. TUCCILLO:  I lived in Boston for ten years, does that help my case?

THE COURT:  Hey, there we go.

All right.  You guys know the dates.  We're going to put it in the minute entry order, but everybody is clear about the dates?

MR. TUCCILLO:  Yes.

MR. SILVIA:  Yes.

THE COURT:  All right.  Is there anything else that I need to do before we adjourn?

MR. SILVIA:  Not from the Defendants, Your Honor.

MR. TUCCILLO:  I don't think so, Your Honor.

THE COURT:  Thank you very much, gentlemen.  I do look forward to your submissions.  Educate me where you can, please.

MR. TUCCILLO:  Thank you, Your Honor.  And thank you for your service.

THE COURT:  Thank you.  Bye now.

(Whereupon, the matter was concluded.)

*     *     *     *     *

*AVERY N. ARMSTRONG, RPR*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Avery N. Armstrong        March 11, 2023