**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YOR**

| | |
|---|---|
| IN RE SPERO THERAPEUTICS, INC. SECURITIES LITIGATION | Civil No. 1:22-CV-03125-LDH-RLM |
| | <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**MEMORANDUM IN OPPOSITION TO**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

Date served:  May 31, 2023

Matthew L. Tuccillo
**POMERANTZ LLP**
600 Third Avenue, 20th floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: mltuccillo@pomlaw.com

*Plaintiffs' Lead Counsel*

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL ALLEGATIONS .................................................................................. 2

    A.    Tebipenem HBr & The ADAPT-PO Trial ................................................. 2

        1.    The Importance To Spero And Its Investors ................................. 2

        2.    Undisclosed Negative Facts And Red Flags ................................. 2

    B.    Defendants' False Or Misleading Statements & Omissions ....................... 3

    C.    Defendants Acted with Scienter ................................................................. 5

    D.    Partial Corrective Disclosures & Events Revealed The Fraud ................... 7

III.  ARGUMENT ........................................................................................................ 7

    A.    Applicable Legal Standards ........................................................................ 7

    B.    The FAC Sufficiently Pleads False Or Misleading Statements And Omissions .................................................................................................... 9

        1.    Defendants Had A Duty Of Disclosure, Which They Violated ...................................................................................... 10

        2.    Defendants' Claims Of Blanket Immunity Fail ........................... 19

    C.    The FAC Sufficiently Pleads A Strong Inference Of Defendants' Scienter ..................................................................................................... 23

        1.    The Knowledge And Recklessness Allegations .......................... 23

        2.    The Motive And Opportunity Allegations .................................. 25

        a.    Suspicious Insider Transactions .................................................. 25

        b.    Suspicious Executive Compensation And Bonuses ..................... 26

        c.    Spero's Unearned, Windfall Government Payments .................... 27

        d.    Spero Raised Funds During The Fraud ....................................... 27

        3.    The FAC's Core Operations Doctrine Allegations ...................... 28

        4.    Defendants Signed, Were Quoted In, SOX-Certified Misstatements ............................................................................. 28

        5.    Corporate Code of Conduct Violations ....................................... 28

        6.    Defendants' Competing Inference Is Not More Compelling ........ 29

    E.    The FAC States A Control Person Claim Under §20(a) ........................... 30

IV.   CONCLUSION .................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ...................................................................................9

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...................................................................................................23

*Beach v. Healthways, Inc.*,
2009 WL 650408 (M.D. Tenn. Mar. 9, 2009) .......................................................................27

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)......................................................................................9

*Chabot v. Walgreens Boots Alliance, Inc.*,
2023 WL 2908827 (M.D. Pa. Mar. 31, 2023).......................................................................21

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)................................................................................28

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023) ...................................................................................................8

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015)..................................................................................................20

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014) ....................................................................................19

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................26

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)....................................................................................................9

*Geisler v. Petrocelli*,
616 F.2d 636 (2d Cir. 1980).....................................................................................................7

*George v. China Automotive Sys, Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).........................................................................26

*Gerneth v. Chiasma, Inc.*,
2018 WL 935418 (D. Mass. Feb. 15, 2018) ..........................................................................21

*Gregory v. ProNAi Theapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)................................................................................16

*Grund v. Delaware Charter Guar. & Tr. Co.*,
    788 F. Supp. 2d 236 (S.D.N.Y. 2011)...............................................................................25

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)...............................................................................22

*In re Agean Marine Petroleum Network, Inc. Sec. Litig.*,
    529 F. Supp. 3d 111 (S.D.N.Y. 2021)...............................................................................26

*In re Alkermes Pub. Co. Sec. Litig.*,
    523 F. Supp. 3d 283 (E.D.N.Y. 2021) .........................................................................21, 25

*In re Amylin Pharms., Inc. Sec. Litig.*,
    2003 WL 21500525 (S.D. Cal. May 1, 2003)................................................................19, 21

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)...............................................................................12

*In re Delcath Sys., Inc. Sec. Litig.*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014)..........................................................................18, 19, 25

*In re Forcefield Energy Inc. Sec. Litig.*,
    2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ...................................................................30

*In re Glob. Brokerage, Inc.*,
    2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) ....................................................................8

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .....................................................................28

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)................................................................................7

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..........................................................12, 28, 30

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)................................................................................21

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..............................................................................................8

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014)................................................................................28

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................27, 30

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993)........................................................................................28

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
   319 F. Supp. 2d 152 (D. Mass. 2004) .....................................................................19

*In re Vale S.A. Sec. Litig.*,
   2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .........................................................30

*In re Viropharma, Inc. Sec. Litig.*,
   2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ............................................................19

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016).............................................................8, 11, 16, 20

*In re Vivendi Universal, S.A.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003).....................................................................27

*In re Xerox Corp. Sec. Litig.*,
   165 F. Supp. 2d 208 (D. Conn. 2001) .....................................................................12

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................................21

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013)....................................................................................11

*Lefkoe v. Jos. A. Bank Clothiers*,
   2007 WL 6890353 (D. Md. May 13)........................................................................26

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ..............................................................................9, 30

*Manavazian v. Atec Grp., Inc.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) ....................................................................26

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..........................................................................................9, 16, 20

*Meyer v. JinkoSolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014).............................................................................8, 16, 20

*New Orleans Emps. Ret. Sys. v. Celestia, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) ...............................................................................28

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ....................................................................................27

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................................................8, 9

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
  2020 WL 3268531 (S.D.N.Y. June 17, 2020) .......................................................21

*Perez v. Higher One Holdings, Inc.*,
  2017 WL 4246775 (D. Conn. Sept. 25, 2017) ...................................................28, 29

*Plumbers and Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020).........................................................28

*Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................................9

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)......................................................................................25

*Sanders v. AVEO Pharm., Inc.*,
  2015 WL 1276824 (D. Mass. Mar. 20, 2015)..........................................................21

*Schaeffer v. Nabriva Therapeutics*
  *plc*, 2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)..................................................21

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ......................................................................19

*Stocke v. Shuffle Master, Inc.*,
  615 F. Supp. 2d 1180 (D. Nev. 2009)......................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................9, 29, 30

*Tomaszewski v. Trevena, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa. 2020) ......................................................................22

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..........................................................................20, 21, 22

*U.S. ex rel. Kester v. Novartis Pharms. Corp.*,
  23 F. Sup. 3d 242, 252 (S.D.N.Y. 2014) ..................................................................8

*U.S. v. Kortbawi*,
  2021 WL 4931950 (2d Cir. Oct. 22, 2021)...............................................................8

*Van Dongen v. CNinsure, Inc.*
951 F. Supp. 2d 457 (S.D.N.Y. 2013)....................................................................28

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
57 F. Supp. 3d 950 (D. Minn. 2014)......................................................................22

*Whalen v. Hibernia Foods PLC*,
2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005).........................................................25

*Wilson v. Merrill Lynch & Co., Inc.*,
671 F.3d 120 (2d Cir. 2011)..................................................................................11

*Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*,
474 F. Supp. 2d 505 (S.D.N.Y. 2007)....................................................................27

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597 (4th Cir. 2015) ................................................................................22

**Statutes**

15 U.S.C. §78j(b) .........................................................................................8, 9, 17, 30

15 U.S.C. §78t(a) ........................................................................................................30

Private Securities Litigation Reform Act of 1995 ....................................................8, 9

**Other Authorities**

17 C.R.F. § 240.10b-5..............................................................................................2, 26

Lead Plaintiff Kashif Memon and Plaintiffs Richard S. Germond and Nabil Saad (altogether "Plaintiffs") in the above-captioned securities fraud action respectfully file this Opposition to Defendants' Motion to Dismiss ("Motion"), which seeks dismissal of Plaintiffs' First Amended Class Action Complaint (Dkt. No. 20) ("FAC")[1] for the bases set forth in Defendants' supporting memorandum of law ("Memo").  For the following reasons, Plaintiffs respectfully ask that the Court deny Defendants' Motion and order the parties into discovery.

## I.    INTRODUCTION

Defendants posit that pharmaceutical companies enjoy a unique carveout from the federal securities laws and binding Supreme Court precedent, absolving them from the bedrock obligation to speak the full truth once a decision is made to communicate with investors.  In their view, until the FDA issues a "binding decision," they are free to say whatever the please, half-truth or otherwise, misleading or not, throughout the entire multi-year process of advancing a drug candidate down the path of potential FDA approval.  Their proposed exemption is illogical, dangerous, and counter to the case law, both in the Second Circuit and elsewhere.

Contrary to the pleadings, which must be accepted as true and construed in the Plaintiffs' favor, Defendants further depict the FDA, one of the world's foremost regulatory bodies for pharmaceutical approval, as an fickle adversary, with near vindictive disregard for Spero, its management, and its investors.  They disclaim any advance warning as to the FDA's concerns about the ADAPT-PO Trial, its inclusion of gram-positive patients, and tebipenem HBr's NDA from the FDA's months of intense scrutiny, meetings, and weekly communications.  They instead baselessly suggest that the FDA's deficiency letter – which the possess and could have submitted among their hundreds of pages of judicial notice materials – concerned other, unidentified topics, and that the FDA "radically" waited until the "eleventh hour" to spring its serious concerns on an unsuspecting, victimized Spero.  They give no explanation for the FDA's purported actions.

Plaintiffs respectfully ask the Court to reject these tactics and deny Defendants' motion.

---

[1]    Herein, unless otherwise noted, all "¶" references are to the FAC's numbered paragraphs, all "§" references are to the FAC's sections, all defined terms have the definitions assigned in the FAC, and all emphasis is added.

## II.    FACTUAL ALLEGATIONS

On December 5, 2022, Plaintiffs filed the FAC, which pleads class action claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 during the Class Period extending from September 8, 2020 through May 3, 2022, inclusive.

### A.    Tebipenem HBr & The ADAPT-PO Trial

#### 1.    The Importance To Spero And Its Investors

Spero is a clinical-stage biopharmaceutical company focused on developing treatments for multi-drug resistant ("MDR") bacterial infections and rare diseases. ¶35. During the Class Period, its "lead product candidate" was SPR994, a/k/a tebipenem pivoxil hydrobromide ("tebipenem HBr"), an anti-bacterial pill meant to be an alternative to an FDA-approved drug, intravenous ("IV") ertapenem, for treatment of MDR infections, including complicated urinary tract infections ("cUTI") and acute pyelonephritis ("AP"). ¶¶3, 34-37. Developing and bringing tebipenem HBr to market was vital for Spero's revenue generation and stock performance. ¶38.

Pre-Class Period, Spero initiated U.S. patient enrollment in a "pivotal" Phase 3 clinical trial ("ADAPT-PO Trial") to support a New Drug Application ("NDA") for tebipenem HBr on February 4, 2019 (¶¶3, 39, 41), and announced tebipenem HBr's Fast Track Designation, which meant more frequent interactions with the FDA regarding the ADAPT-PO Trial and the sufficiency of its data, on March 29, 2019 (¶¶5-6, 41, 56-57, 170-174). Confidential witnesses ("CWs") described unusually high FDA scrutiny and communications throughout the Class Period. ¶¶6, 48-49. By May 2020, Defendants chose to complete total enrollment at 1,372 patients, despite knowing that a data review committee recommended increasing enrollment to 1,450 patients and that a sizable minority of enrolled patients were infected with gram-positive bacteria, which the trial's comparison drug, IV ertapenem, was not indicated to treat. ¶¶41-42, 52, 168-169.

#### 2.    Undisclosed Negative Facts And Red Flags

Defendants were always aware of serious risks to the tebipenem HBr NDA, including that IV ertapenem was not indicated to treat gram-positive bacteria, gram-positive patients were riskily included in the ADAPT-PO Trial's patient population, and that their inclusion impacted the trial's

2

required non-inferiority margin of -12.5% when tebipenem HBr was compared against IV ertapenem. ¶54. According to CW1, Spero's Director of Clinical Data Management, tebipenem HBr's Fast Track Designation in March 2019 expedited FDA review and increased contacts with the FDA, whereby it "holds your hand through the whole process." ¶¶48, 56. By the time pre-NDA meetings began in September 2020, FDA was already providing feedback on the trial data, and starting December 2021 and peaking in January/February 2022, CW2, Associate Director Regulatory Affairs, described intense weekly scrutiny about mainly clinical issues – more than CW2 had ever seen in a 20-year career overseeing drug NDAs. ¶¶49, 57.

According to multiple CWs, in March 2022, Defendants held a company-wide conference call with Defendants Mahadevia and Shukla, announcing that Spero received FDA's notice citing NDA deficiencies, but Defendants withheld the details. ¶¶50-53. On March 31, 2022, Defendants only disclosed to the market that FDA identified "deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time." ¶156. In early April 2022, the "leadership team" instructed CW2 to make all FDA submission documents confidential, limiting access to just a handful of people including Defendant Mahadevia. ¶49. High-level CW5 was brought "into the tent" and learned during preparations for Spero's April 2022 Late Cycle Meeting (LCM) with FDA that FDA wanted to remove gram-positive patients, because the comparison drug, IV ertapenem, was not indicated to treat gram-positive bacteria and FDA feared that approving tebipenem HBr would lead to increased bacterial resistance to the entire carbapenem drug class. ¶52. On May 3, 2022, Defendants announced that FDA advised at the LCM that the ADAPT-PO Trial data may be insufficient to support approval, Spero was immediately halting commercialization efforts for tebipenem HBr, and it was abruptly laying off 75% of employees, stunning several CWs and leading CW6 to believe layoffs had been well underway. ¶¶53, 159.

**B.      Defendants' False Or Misleading Statements & Omissions**

The FAC pleads a 3-prong securities fraud via public statements and omissions during the Class Period: a Business Operations & Clinical Trial Fraud (FAC §V.E.1., ¶¶59-138); Reported Results Fraud (FAC §V.E.2., ¶¶139-146); and Internal Controls Fraud (FAC §V.E.3., ¶¶147-153).

The Business Operations & Clinical Trial Fraud misrepresented the ADAPT-PO Trial and tebipenem HBr NDA. Defendants' misstatements included, *e.g.*, "The pivotal Phase 3 clinical trial of oral tebipenem HBr *met the primary endpoint*, *demonstrating statistical non-inferiority* versus IV ertapenem" (*e.g.*, ¶¶59, 61, 73, 87, 93, 125); "oral tebipenem is comparable in its effectiveness for cUTI patients to IV ertapenem *meeting the minus 12.5 percent non-inferiority margin* set up by the FDA" (*e.g.*, ¶65, 67, 79, 103, 109, 115); "we randomized a *fairly large patient set*, almost 1,350 patients" (*e.g.*, ¶¶73, 115, 127, 168); tebipenem HBr "is a carbapenem with *broad-spectrum activity against Gram-positive* and -negative *bacteria* that is being developed *for the treatment of patients with complicated urinary tract infections*" (*e.g.*, ¶71); and that the ADAPT-PO Trial could serve as the "*One well-controlled pivotal trial to form the basis for an NDA submission*" (*e.g.*, ¶¶59, 63, 77, 89, 97, 123). Defendants' positive recitations like these *never* changed until Class Period's end – even as they frequently met with FDA through the end of 2021 (¶¶59-116); when FDA's scrutiny intensified and it grilled Defendants with volumes of questions/concerns on a weekly basis starting December 2021 and peaking in January/February 2022 (¶¶117-124); when they received FDA's deficiency letter in March 2022 (¶¶125-126); during early April 2022 while they prepared for the LCM with CW5 attempting to marshal support for why tebipenem HBr would be under-prescribed and not risk increasing bacterial resistance (¶¶127-136); and even after receiving the FDA's negative feedback at the LCM on April 27, 2022 (¶¶137-138).

The Reported Results Fraud pleads that Spero's SEC filings K reported purportedly positive financial results and operating metrics without disclosing that they were generated through, and artificially inflated by, improper practices, unreported setbacks, and undisclosed risks and negative trends, *e.g.*, the ADAPT-PO Trial's insufficiently evaluable patient population and deficient data, and alleges that the MD&A section contained affirmative misstatements and omissions. ¶¶139-145. It alleges these statements were materially false and misleading, in violation of SEC Regulation S-K, Item 303. ¶146.

4

The Internal Controls Fraud pleads misrepresentations about the sufficiency of Spero's internal controls via false or misleading Sarbanes-Oxley Act (SOX) certifications signed by Defendants Mahadevia and Shukla that accompanied Spero's Forms 10-Q and 10-K. ¶¶147-152.

The FAC alleges with particularity that Defendants' statements were materially false or misleading because of material undisclosed facts, including that they knowingly decided to disregard the data review committee's recommendation to increase the ADAPT-PO Trial's enrollment to the protocol-allowed maximum (¶¶42, 52, 168-169); knowingly included gram-positive patients in the trial's population (¶¶55, 71, 93, 129, 135, 169); and faced increasingly intense scrutiny over the ADAPT-PO Trial's clinical data as early as the pre-NDA meetings in September 2020 that reached a peak between December 2021 and February 2022 as described by CWs (¶¶5-6, 47-53, 56-57, 168-174). Defendants continued to conceal the full truth even after the FDA's March 2022 deficiency letter (¶¶50-53, 125, 156) put them on notice in the leadup to the LCM (¶¶127-136) of the FDA's serious concerns that the ADAPT-PO Trial included gram-positive patients despite the comparator drug not being approved for treatment of infections by gram-positive bacteria and that approving tebipenem HBr could increase bacterial resistance for the entire drug class (¶¶52, 169). They did so even after the LCM itself (¶¶137-138), before finally disclosing that the ADAPT-PO Trial's data package could not support FDA approval. ¶¶159-160.

### C.    Defendants Acted with Scienter

The FAC alleges a strong inference of Defendants' scienter based on motive and opportunity, actual knowledge, recklessness, and other circumstantial evidence that must be viewed holistically. ¶¶164-204. Specifically:

Actual knowledge of reckless disregard (¶¶165-175, 193-196): The FAC pleads Defendants' knowledge or reckless disregard of red flags as supporting scienter, including that an ADAPT-PO Trial data review committee recommended using a larger patient population than what Defendants chose in May 2020 (¶¶42, 52, 168-169) – the problem that caused Spero to disclose the trial data's deficiencies, after the FDA rejected the gram-positive patients. (¶159). Defendants otherwise acted suspiciously and ignored or concealed *many* other red flags that arose

5

during their elevated level of FDA access under the Fast Track Designation (¶¶5, 48, 170-171); their numerous meetings and interactions with FDA regarding its concerns beginning September 2020 and peaking with intensified and unusually high scrutiny between December 2021 and February 2022 as described by CWs (¶¶5-6, 41, 47-53, 56-57, 168-174) and by Defendants themselves;[2] their allowing high level CW1 to quit without any effort to retain CW1 in February 2022 (¶¶48, 174(a)); the FDA's March 2022 deficiency letter, the contents of which, per multiple CWs, Defendants' refused to disclose internally at an ensuing company-wide conference call (¶¶50-53, 174(b)); during preparations for the LCM in early April 2022, when the "leadership team" instructed CW2 to restrict access to all FDA submission documents to a tight circle including Defendant Mahadevia (¶174(c)); while preparing for the LCM, when CW5 tried to research how to persuade FDA that tebipenem HBr would be under-prescribed and not pose a risk of increasing bacterial resistance to the entire drug class in early April 2022 (¶¶52, 127-136); during the LCM itself in April 2022 (¶¶57, 169); and the speed by which Defendants abandoned the NDA, scaled down company operations, and laid off 75% of workers (¶¶53, 174(d)).

Motive and opportunity (¶¶176-192): Defendant Mahadevia netted hundreds of thousands of dollars from insider transactions, which compared suspiciously against his 2019 and 2020 base salaries and were ~163% larger than his net gains during the comparable pre-Class Period time. (¶¶177-178). His transactions were also suspicious in timing vis-à-vis the alleged fraudulent misstatements and partial corrective disclosures. ¶179. Defendants Mahadevia and Shukla also received significant, suspicious executive compensation perks not reflective of actual ADAPT-PO Trial results. ¶¶181-185. Spero raised nearly $86 million from its Q3 2020 stock offering (¶¶186-189) and unjustly reaped millions in unearned windfall reimbursement payments from its U.S. government contract for its ADAPT-PO Trial expenses, which enabled it to report better metrics despite the trial's deficiencies and Spero's inability to fulfill the contract. ¶¶190-192.

---

[2]     *See, e.g.*, ¶¶6, 59, 63, 65, 67, 73, 77, 79, 87, 89 (discussed "FDA interactions" and planned pre-NDA meeting); ¶¶6, 91 (by May 2021, Defendants disclosed occurrence of at least one pre-NDA meeting at which they discussed "format and content of the planned data package" and "received feedback"); ¶¶6, 107, 109, 113, 115, 117, 123 (starting September 2020, Mahadevia referenced additional "multiple" antecedent discussions with FDA concerning whether the ADAPT-PO Trial could support the NDA).

Additional allegations (¶¶193-204): Spero's development of tebipenem HBr was part of its "core business," tebipenem HBr was it "most advanced" product candidate, and Spero was heavily reliant upon it to generate revenues and growth, implicating the core operations doctrine. ¶¶193-194. Defendants Mahadevia and Shukla signed, were quoted in, and/or certified under the Sarbanes-Oxley Act of 2022 ("SOX") alleged misstatements and were under duties to investigate, familiarize themselves with the subject matter, and speak truthfully. ¶¶195-196. The alleged fraud violated Spero's Code of Conduct provisions. ¶¶198, 199, 204.

### D.    Partial Corrective Disclosures & Events Revealed The Fraud

After Defendants' steady drumbeat of positive statements, the market was shocked by the news on March 31, 2022 that FDA had notified Spero of tebipenem HBr's "deficiencies that precluded discussion of labeling and post-marketing requirements/commitments," which caused a $1.59 (-18.28%) stock drop on April 1, 2022. ¶¶8, 154-156. Defendants muted the drop by continued misstatements that Spero could remedy deficiencies by the LCM. ¶¶9, 158. Yet, on May 3, 2022, Spero disclosed that it was immediately halting commercialization attempts for tebipenem HBr, slashing its employees by 75%, and restructuring operations, because the ADAPT-PO Trial could not support the tebipenem HBr NSA due to FDA's concerns about Spero's decision to include gram-positive patients, which, when removed, meant the trial data could not meet the FDA's pre-specified non-inferiority margin. ¶¶8, 154,159-160. This news caused a massive $3.24 per share (-63.65%) stock drop on May 3, 2022. ¶¶10, 161. These disclosures and declines inflicted huge losses on investors. ¶¶11, 163. This lawsuit is their chance at a recovery.

## III.   ARGUMENT

### A.    Applicable Legal Standards

The Court, when deciding a motion to dismiss under Rule 12(b)(6), only "assess[es] the legal feasibility of the complaint;" it does not "assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613,

7

621 (S.D.N.Y. 2003) (quoting *Weisman v. LeLandais,* 532 F.2d 308, 311 (2d Cir.1976) (per curiam)). In considering a motion to dismiss, a court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014). Dismissal is appropriate only where "[Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Id*. Here, Defendants challenge only two of the six elements to a §10(b) claim – material misstatements or omissions (often short-handed to falsity) and scienter.[3]

As for the first, §10(b) plaintiffs must plead materially false *or* misleading statements. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016). A plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001). Plaintiffs meet their pleading burden by identifying with particularity the allegedly false or misleading statements, *i.e.*, "the who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Sup. 3d 242, 252 (S.D.N.Y. 2014). At the pleading stage, a plaintiff must merely plead sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). If a complaint specifies defendants' misleading statements, identifies who made them, states where and when the statements were made, and explains why they were misleading, that is all the PSLRA requires at this stage. *See Id.* at 306. "'[W]hether a reasonable investor would find a particular statement misleading . . . is usually a matter reserved for the trier of fact.'" *In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *9 (S.D.N.Y. Mar. 28, 2019).

For scienter, "accepting all factual allegations in the complaint as true," "[t]he inquiry…is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of

---

[3]   Under black-letter law, they have waived all argument at this stage as to the other claim elements, including loss causation. *See, e.g.*, *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716 n.4 (2d Cir. 2023) (arguments not raised in opening brief, even if pursued at lower court or raised in reply brief, waived); *U.S. v. Kortbawi*, 2021 WL 4931950, at *1 n.1 (2d Cir. Oct. 22, 2021) (arguments not raised in opening brief are waived, even if raised in a reply brief).

8

scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-323 (2007). "The inference [of] scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of completing inferences.'" *Id.* at 324. Instead, scienter is adequately pled if, upon review of "all the allegations holistically," "a reasonable person would deem the inference…cogent and at least *as compelling* as any opposing inference one could draw from the facts alleged." *Matrixx*, 563 U.S. at 38, 48 (quoting *Tellabs*, 551 U.S. at 324, 326); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (177 (2d Cir. 2015). "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012); *see also Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) (quoting *City of Brockton Ret. Sys. v. Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008)). §10(b) plaintiffs can sufficiently plead scienter with allegations that Defendants knew or recklessly disregarded facts rendering their public statements materially false or misleading. *Novak*, 216 F.3d at 307-308, 311. While the FAC extensively pleads Defendants' motive and opportunity, a showing of scienter does not require evidence of motive. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000). "When making the assessment whether scienter has been adequately pleaded, it is prudent to keep in mind that the PSLRA does not require a plaintiff to prove his case in his complaint" and a "[p]laintiff generally must frame the facts respecting the defendant's mental state (*i.e.*, the scienter element of the claim) without the benefit of discovery, and therefore, most often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 131 (D. Conn. 2021).

### B.     The FAC Sufficiently Pleads False Or Misleading Statements And Omissions

The FAC undisputedly identifies the "who, what, when, where, and how" of the alleged misstatements, and it relies on well-pled circumstantial evidence and logical inferences to establish the rough timeline of when Defendants were *increasingly on notice* that the *FDA* had *growing concerns* arising from *facts* concerning the ADAPT-PO trial about which Defendants had been

9

fully aware *throughout* their public statements.  Defendants' arguments (Memo at 12-21), boiled down, would create *blanket immunity* from liability for themselves and *any* other pharmaceutical company unless a securities plaintiff could pinpoint the *exact moment* they received *smoking gun* evidence rendering their statements false.  Even then, Defendants seek *ironclad carveouts* from *any* liability, spanning the *entire period* of "dialogue" between the FDA and a pharmaceutical company, up to the moment that a "*binding decision*" is rendered.  Then and only then – in the extraordinarily narrow and egregious instance where a pharmaceutical company and its executives literally lies about a final, binding FDA decision – would Defendants concede, barely, that liability could even conceivably arise.  As Defendants propose it, this blanket immunity would apply, without *any* regard for the content of the public statements that Defendants *chose* to make to analysts and investors.  That is simply not the law, in the Second Circuit or anywhere.

### 1.    Defendants Had A Duty Of Disclosure, Which They Violated

As the FAC pleads, Defendants' statements, *e.g.*, that tebipenem HBr satisfied the required non-inferiority margin (*e.g.*, ¶¶59, 63, 65, 67, 71, 77, 79, 89, 97, 103, 107, 109, 115, 123, 127), that the ADAPT-PO study was sufficiently enrolled (*e.g.*, ¶¶73, 115, 127, 168) and met its primary endpoints (*e.g.*, ¶¶59, 61, 63, 67, 69, 71, 73, 77, 79, 87, 89, 91, 93, 97, 101, 103, 111, 113, 123, 125, 140, 141), or that the trial data could support FDA approval (*e.g.*, ¶¶73, 87, 91, 97, 101, 103, 107, 109, 113, 115, 123), were always *at least* materially *misleading*, if not false.  Inclusion of patients infected with gram-positive bacteria – a fact known when each patient was enrolled (¶55) – created *undisclosed, material risks* to FDA approval within the ADAPT-PO trial's evaluable patient population and data set (¶¶54-55), particularly where the comparator drug, IV ertapenem, was *not indicated* for treatment of gram-positive bacteria (¶¶52), where Defendants *never* enrolled the ADAPT-PO Trial to its permissible maximum of 1,450 patients (¶¶168), and where Defendants *disregarded* the data review committee's recommendation, after its blinded reassessment, that ADAPT-PO Trial should be enrolled to the maximum to ensure adequate power for measurement of the primary endpoint (¶¶55, 168).  Contrary to their "fraud by hindsight" arguments (*e.g.*, Memo at 12, 14-15), Defendants undisputedly knew these facts *throughout* the Class Period, including

10

when they ***chose to make*** public statements ***specifically about*** the sufficiency of the ADAPT-PO trial's enrollment and trial data – even as they were put increasingly on notice by the FDA that those very risks had materialized and negatively impacted the NDA.

The FAC passes muster by pleading that Defendants' statements, at minimum, were materially ***misleading***. *Vivendi*, 838 F.3d at 239. "With regard to the statements that are actually made, 'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'" *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010)). "Statements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors.'" *Id.* (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." *Id.* (quoting *McMahan*, 900 F.2d at 579). Thus, in the Second Circuit, "[t]he law is well-settled…that so-called 'halftruths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 131 (2d Cir. 2011).

Here, the FAC pleads not only risks Defendants knowingly concealed throughout their Class Period public statements, but also facts demonstrating that the FDA's ***escalating*** scrutiny, concerns, and feedback repeatedly put them ***on notice*** that those risks had ***materialized*** and rendering their ongoing public statements materially misleading. Tebipenem HBr's Fast Track Designation in March 2019 meant ***increased interaction*** with Spero and a ***rolling review*** of its NDA effort, where, per Spero's Director of Clinical Data Management (CW1), the FDA "***hold[s] your hand*** through the whole (process)." ¶¶5, 41, 48, 56, 170-172. In this context, the FAC pleads extensive CW statements detailing how the FDA's "frenetic" scrutiny, frequent communications, and consistent concerns put Defendants on notice that their public statements were materially

11

misleading, if not false – a fraud in real time, not "hindsight" (Memo at 12, 14-15), which lays out what the Defendants knew (*id.* at 17-19) and when (*id.* at 19-21).[4]  Specifically:

- **September 2020 – November 2021**.  Between September 2020 and March 2021, Defendants held "***pre-NDA meetings***" with the FDA, including, as Defendant Mahadevia said, "***multiple***" discussions about ***whether the ADAPT-PO Trial could support the NDA submission*** for tebipenem HBr.  ¶¶6, 172.  Under analyst questioning, Defendants said that such meetings *discussed* "the format and ***content of the planned data package***" for the tebipenem HBr NDA and that they had "***received feedback***" from the FDA.  *Id.*  These alleged facts put Defendants on notice that the undisclosed risks concerning the ADAPT-PO Trial's patient population, trial data, and non-inferiority margin had begun to materialize, rendering Defendants' alleged misstatements during this time period materially misleading.[5]  FDA's concerns and scrutiny increased, unabated.

- **December 2021 – February 2022**.  CW2, an Associate Director in Spero's Regulatory Affairs Department, recounted the FDA's frenetic scrutiny, whereby "***a couple of times a week***" – "***every week***" – it posed "***so many questions***" of a ***clinical*** nature, requested more ***clinical*** information, and gave "***a lot of comments***," starting in December 2021 and peaking in January and February 2022.  ¶¶6, 173.  CW2, a multi-decade drug development and regulatory affairs veteran, said the FDA's scrutiny level and the volume and frequency of its questions were "***weird***" and ***significantly higher*** than CW2 had seen in any NDA process, causing CW2's concern that tebipenem HBr NDA was "shaky."  *Id.*[6]  Spero made no effort to retain CW1, who quit in

---

[4]  *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at \*17 (S.D.N.Y. Apr. 22, 2016) (rejecting defendants' fraud-by-hindsight argument and emphasizing that "[c]ourts often reject an incantation of fraud-by-hindsight when plaintiffs allege that 'the company failed to take into account information that was available to it' at the time that the company issued the incorrect statements or omissions"); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 504 (S.D.N.Y. 2011), *on reconsideration*, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011) and 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011) ("incantation of fraud-by-hindsight" will not defeat allegation of misrepresentations and omissions that were misleading when made); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (defendants' fraud by hindsight argument mischaracterized plaintiffs' complaint which alleged the individual defendants made fraudulent statements to cover up specific problems).

[5]  *See* FAC ¶¶59, 61, 63, 65, 67, 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95, 97, 99, 101, 103, 105, 107, 109, 111, 113, 115.  In addition to those alleged misstatements from the Business Operations & Clinical Trial Fraud, the FAC also pleads misstatements in this time frame in the Reported Results Fraud (¶¶140-144) and the Internal Controls Fraud (¶¶148, 150-152).

[6]  Contrary to the Memo at 15, CW2's statement, based on decades of experience with drug NDAs, *does* establish that the FDA's scrutiny here was elevated and "weird."

February 2022, which CW1 found "suspicious." ¶48.  These additional well-pled facts, combined with those predating, further put Defendants on notice as to the materialization of the undisclosed risks concerning the ADAPT-PO Trial's patient population, trial data, and non-inferiority margin, and rendered Defendants' alleged misstatements during this time period.[7]

- **March 2022 – April 2022**.[8]  CW3 (Spero's Lead Medical Science Liaison Director) and CW4 and CW6 (both Spero Medical Science Liaisons) said Defendants Mahadevia and Shukla were on a March 2022 company-wide call internally announcing that FDA had sent a *letter* outlining *deficiencies* in the tebipenem HBr NDA, the specifics of which they refused to disclose, keeping the CWs in the dark until after being laid off 1-2 months later. ¶¶27-28, 50-51, 53, 174(b).  Indeed, Spero leadership instructed CW2 to restrict access to the FDA submission materials to Defendant Mahadevia and six individuals. ¶¶49, 174(c).  CW5, a high-level employee reporting directly to Spero's COO, was brought "into the tent" to help executives prepare for the late April 2022 LCM with FDA and learned *during* those preparations – ___*before*___ the LCM – that FDA wanted to remove gram-positive patients from the ADAPT-PO Trial's evaluated population because gram-positive bacteria are resistant to IV ertapenem (the comparator drug), which is not FDA approved to treat gram-positive bacteria in cUTI, and the FDA was concerned that approving tebipenem HBr could increase bacterial resistance to the entire carbapenem drug class. ¶¶52, 169. CW5's work ___*before*___ the LCM sought to dissuade FDA from removing the gram-positive patients, through research indicating that doctors would *not be widely prescribing tebipenem HBr*, which instead would be *under*-prescribed as a *last line* treatment – a far cry from Defendants' portrayal of it as a cheaper, easier-to-use pill that could broadly replace its IV-administered precursors (¶36) – a usage rate that purportedly would not risk increasing bacterial resistance to the drug class.  *Id.*[9] CW2 described Spero's response to the FDA in April 2022 as not being a big one.  ¶49.

---

[7]   *See* FAC ¶¶117, 119, 121, 123.

[8]   The March 2022 start date for this category can be set at the date of FDA's letter.

[9]   Given these allegations regarding CW5, Defendants' claims that the "FAC says nothing about the contents of the FDA's interim feedback to Spero" (Memo at 14), that CW5 could not "report anything unusual or untoward in what the FDA was saying" (*id.* at 16), and that "the FAC does not allege that there were any relevant communications between the FDA and Spero between the date of the 'deficiency notice' (late March) and the date of the Late Cycle Meeting (late April) (*id.* at 21) are simply wrong.

During this time, Defendants *chose to speak* to investors about the FDA's *reaction* to the tebipenem HBr NDA and *materially miscast and understated* FDA's concerns and intentions to remove the gram-positive patients, by stating on March 31, 2022, only that the FDA "has notified Spero that, as part of its ongoing review of Spero's New Drug Application for tebipenem HBr, it has identified deficiencies that *preclude discussion of labeling and post-marketing requirements / commitments* at this time." ¶156.  Seeking to mute the 18.28% stock drop this half-truth caused, Defendants *in the same breath* said they "continue to believe in *the strength of our application*" and the "foundation of that is *our previously announced data* from the Phase 3 ADAPT-PO Trial," which "showed the trial *meeting its primary endpoint*…by demonstrating that oral tebipenem HBr was statistically noninferior to intravenous tebipenem in the treatment of patients with…cUTI," "shows that tebipenem can provide the benefits of an oral therapy *without making any compromises* on clinical response," and "supports our NDA."  ¶125(b)-(c).  They expressed "confidence in tebipenem HBr's commercial potential," adding, "we believe there would be sufficient time to *progress to labelling discussions* within the existing PDUFA timeframe," "we continue to prepare for an *anticipated launch* of tebipenem HBr in the second half of 2022, as we work with the FDA," and "we'll continue to *collaborate* with [the FDA] on the best path forward for tebipenem."  ¶125(a)-(c).  Responding to *multiple, repeated* analyst questions, Defendant Mahadevia said Defendants "continue to have a frequent and active interaction with our colleagues at the FDA" and "continue to engage with them on a variety of subjects" and a "variety of topics. These statements created the materially misleading if not false impression that the interactions with FDA were "productive and collaborative," concerned a "variety" of subjects/topics, and focused on the pathway to "labeling discussions" "on the basis of the data that we've submitted" ¶125(b) – an impression *wholly untethered* to the realities, gravity, and focus of FDA's concerns and intentions to remove gram-positive patients from the study data and Spero's meager response.

Defendants persisted *throughout* April 2022, specifically touting tebipenem HBr's ability to treat *all infection types and uropathogens*, including infections by *gram-positive or drug-resistant bacteria*.  An April 6, 2022 Spero press release linked to a NEJM's article publishing the

14

ADAPT-PO Trial's data, which described the "microbiologically evaluable population" of patients as including both the "intention-to-treat population," consisting of "*all* the patients who underwent randomization" and had a confirmed diagnosis, and the "safety population," consisting of "*all* the patients who received at least one dose of a trial drug" (¶127(a)-(b)) and which said the trial showed that tebipenem HBr was non-inferior to IV ertapenem and the "*Results were consistent across trial populations and subpopulations*, *infection types*, and *causative uropathogens*." ¶127(b). An April 7, 2022 Spero presentation said the ADAPT-PO Trial's primary endpoint was met and tebipenem HBr was non-inferior to IV ertapenem, based on displayed data from *both* gram-negative and *gram-positive* patients (as shown in FAC Figure 12, copied below), and the NDA was on track. ¶129(a)-(b). Spero published articles, posted to its website, which described tebipenem HBr on April 11, 2022 as the "first oral carbapenem for treatment of serious bacterial infections due to *gram-positive* and gram-negative bacteria, *including drug-resistant pathogens* (¶131) and on April 14, 2022 as having "broad-spectrum activity" against *multi-drug-resistant*" bacteria (¶133). An April 21, 2022 Spero press release linked to presentation materials on its website touting tebipenem HBr as non-inferior to IV ertapenem based on *secondary* analysis of ADAPT-PO Trial data, separated into gram-negative and *gram-positive* categories. ¶135(a)-(b).

*Figure 12:*

**Table 2. Uropathogens isolated from urine and/or blood at baseline (micro-ITT)**

| Baseline Pathogen | TBP-PI-HBR (N=449) | Ertapenem (N=419) | Total (N-868) |
|---|---|---|---|
| **Enterobacterales** | 397 (88.4%) | 386 (92.1%) | 783 (90.2%) |
| *Escherichia coli* | 287 (63.9%) | 270 (64.4%) | 557 (64.2%) |
| *Klebsiella pneumoniae* | 53 (11.8%) | 71 (16.9%) | 124 (14.3%) |
| *Proteus mirabilis* | 35 (7.8%) | 23 (5.5%) | 58 (6.7%) |
| *Enterobacter cloacae* | 11 (2.4%) | 8 (1.9%) | 19 (2.2%) |
| *Citrobacter freundii* | 4 (0.9%) | 3 (0.7%) | 7 (0.8%) |
| *Citrobacter koseri* | 3 (0.7%) | 4 (1.0%) | 7 (0.8%) |
| *Klebsiella oxytoca* | 4 (0.9%) | 3 (0.7%) | 7 (0.8%) |
| *Providencia rettgeri* | 4 (0.9%) | 3 (0.7%) | 7 (0.8%) |
| *Klebsiella variicola* | 2 (0.4%) | 4 (1.0%) | 6 (0.7%) |
| *Serratia marcescens* | 4 (0.9%) | 2 (0.5%) | 6 (0.7%) |
| *Morganella morganii* | 4 (0.9%) | 1 (0.2%) | 5 (0.6%) |
| **Gram-positive cocci** | 76 (16.9%) | 51 (12.2%) | 127 (14.6%) |
| *Enterococcus faecalis* | 58 (12.9%) | 36 (8.6%) | 94 (10.8%) |
| *Staphylococcus aureus* | 5 (1.1%) | 8 (1.9%) | 13 (1.5%) |
| *S. saprophyticus* | 4 (0.9%) | 6 (1.4%) | 10 (1.2%) |
| *Enterococcus faecium* | 5 (1.1%) | 2 (0.5%) | 7 (0.8%) |

**Table 3. Per-patient baseline Enterobacterales pathogen resistance phenotypes**

| Enterobacterales Resistance phenotype ‡ | TBP-PI-HBR | Ertapenem |
|---|---|---|
| ESBL+ | 26.5% | 22.0% |
| FQ-non-susceptible | 40.2% | 37.8% |
| TMP-SMX-resistant | 42.4% | 43.5% |

‡ Per CLSI screening criteria: ESBL+ = ceftazidime MIC ≥2 μg/mL; fluoroquinolone (FQ)-non-susceptible = levofloxacin MIC ≥ 1 μg/mL; trimethoprim-sulfamethoxazole (TMP/SMX)-resistant = TMP-SMX MIC ≥ 4/76 μg/mL.

- The TBP-PI-HBr and ertapenem groups were well-matched in age and sex. Approximately 44% of patients were age ≥ 65. **(Table 1)**
- 90% of patients in the micro-ITT were infected with Enterobacterales. **(Table 2)**
- Infections caused by resistant Enterobacterales strains were common. **(Table 3)**

15

Defendants were under a clear duty to speak the whole truth during this time period.[10] Contrary to their claim as to the "collective wisdom" of the case law against a standalone duty to disclose items merely "of interest to investors" (Memo at 13), it is bedrock law that after ***choosing*** to speak on a topic, one must speak the ***whole truth***. *Meyer*, 761 F.3d at 250. Disclosure is required "when necessary 'to make…statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Here, Defendants chose to discuss the FDA's reactions, characterizing them as collaborative and focused on labeling issues, and to describe the ADAPT-PO Trial's data as evidencing tebipenem HBr's ability to treat all "trial populations and subpopulations, infection types, and causative uropathogens," including infections by gram-positive and drug-resistant bacteria. They clearly did not speak the whole truth on these topics. *Vivendi*, 838 F.3d at 258 ("It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no existing independent duty to disclose information' on the issue or topic.") (citing *Meyer*, 761 F.3d at 250).[11][12]

•   **April 28, 2022 – May 3, 2022**. The FDA held its LCM with Defendants on or about Thursday, April 28, 2022. ¶¶29, 53. Defendants concede that – as they disclosed five days later – the FDA conveyed that the ADAPT-PO Trial's data would not support FDA approval, given that the non-inferiority margin was not met based on the evaluable patient population excluding gram-positive patients. The FAC pleads that the LCM was the ***last***, not the first, time that FDA

---

[10]     *See* FAC ¶¶125, 127, 129, 131, 133, 135. In addition to the foregoing alleged misstatements from the Business Operations & Clinical Trial Fraud, the FAC also pleads misstatements in this time frame as part of the Reported Results Fraud (¶¶145) and the Internal Controls Fraud (¶¶149).

[11]     Moreover, where a prior statement has been made, a duty may also arise to update it where it has become misleading due to intervening developments." *Gregory v. ProNAi Theapeutics Inc.*, 297 F. Supp. 3d 372, 401 (S.D.N.Y. 2018) (citing *Caiola v. Citibank*, 295 F.3d 312, 331 (2d Cir. 2002).

[12]     Contrary to Defendants' claim that nothing occurred between May 2022 and the end of April 2022 that might support scienter (Memo at 21), the FAC indeed pleads that CW3, CW4, and CW6 said that company leadership refused to disclose the nature of the deficiencies identified by FDA in March 2022 (¶174(b)); leadership instructed CW2 to restrict access to all FDA submission documents to Defendant Mahadevia and a half-dozen other people in the leadup to the LCM (¶174(c)); Spero continued to reap windfall payments from its government contract in the form of reimbursements of expenses related to the ADAPT-PO Trial and tebipenem HBr's development (¶¶190-192); and CW3, CW4, and CW6 expressed shock at being swept up in a massive wave of layoffs, with immediate auto-payment of severance, which CW6 said must have been underway for quite some time (¶174(d)). That last point helps answer Defendants' question (Memo at 21) of why "continu[e] the charade through April?"

expressed concerns over the ADAPT-PO Trial's patient population and non-inferiority margin data. ¶57. Moreover, despite *all* the earlier alleged facts alerting them to the materialization of undisclosed risks, including without limitation those arising from the LCM, on May 2, 2022, Defendants made yet ***another alleged misstatement*** in a published article posted to Spero's website that, *inter alia*, touted the "antimicrobial activity of tebipenem," as well as its pharmacokinetics and pharmacodynamics as "support[ing] the development of TBI-PI-HBR as an oral drug to treat adult cUTI/AP." ¶137.[13] Just *one day* later, on May 3, 2022, Spero issued a press release announcing that it would "immediately defer commercialization efforts for tebipenem HBR," purportedly based on FDA feedback received at the LCM concerning a "***new analysis***" that altered the ADAPT-PO Trial's evaluable patient population (to remove gram-positive patients) and precluded satisfaction of the required non-inferiority margin, which "suggested that the data package ***may be insufficient*** to support approval ***during this review cycle***." ¶159. This highly-hedged statement, coupled with Spero's disclosure that it was gutting its workforce by 75% and restructuring its operations, shocked analysts (¶160), CWs (CW3, CW4, CW5, CW6) who abruptly lost their jobs in an apparently pre-planned mass layoff (¶¶27-30, 50-53, 174(d)), and investors who saw Spero's stock price crater by 63.65% in a single day (¶161).[14]

Defendants' attempts to depict a fickle FDA that "radically" waited until the "eleventh hour" to inform them of concerns over the ADAPT-PO Trial's inclusion of gram-positive patients in the evaluable population, due to serious drug-resistance concerns, and the impacts resulting on the trial's non-inferiority margin (Memo at 22) is as illogical as it is unsupported by the FAC's allegations. Defendants offer no motive or explanation for the FDA to have singled out Spero for such erratic, disruptive, "radical" mistreatment, which would be tantamount to regulatory abuse. Moreover, Defendants' spin of the alleged facts ***fails to explain*** the FDA's frenetic and unusual engagement with Spero over its clinical data, as discussed above, from September 2020 onward.

---

[13]    Defendants' claim that the FAC alleged no misstatements after the LCM (Memo at 11) is simply wrong.
[14]    As discussed *infra*, the May 3, 2022 press release is pled as a corrective disclosure (¶¶159-161), as to which Defendants do not challenge loss causation, a required §10(b) claim element.

Indeed, significantly, the record – even as Defendants generously augmented via judicial notice – is ***devoid*** of ***any facts*** demonstrating that the FDA had ***any other*** material concern about the tebipenem HBr NDA, aside from its concerns over inclusion of the gram-positive patients in the evaluation population and their effect on the non-inferiority margin. Thus, the FAC's well-pled allegations, which must be ***accepted as true*** and viewed in the light ***most favorable to the plaintiffs***, plead that "the LCM in April 2022 was the *last* – not the first – time" that FDA expressed concerns about the ADAPT-PO Trial's patient population and non-inferiority margin data.  ¶57.

At the pre-motion conference in February, Lead Counsel highlighted the decision in *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014), also cited in Plaintiffs' pre-motion letter (ECF 29 at 2), as being directly on point.[15]  Delcath was a pharmaceutical and medical device company seeking FDA approval for a device used to administer chemotherapy and therapeutic agents to treat liver cancer. *Id.* at 324-325.  Defendants disclosed ***truthful*** information regarding the number and percentage of significant adverse experiences (SAEs) and the mortality rate in the group that received treatments via the device. *Id.* at 331-332.  But, they failed to disclose comparable information for the control group and said that the device caused "similar" side effects to other treatments. *Id.*  The court ruled that these omissions were sufficiently pled as materially misleading for investors, "because, based on the allegations in the complaint, there was a substantial likelihood that disclosure of the omitted data 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available' to the market." *Id.* at 332 (quoting *Matrixx*, 131 S. Ct. at 1318).  It held that "when a pharmaceutical company makes statements about its product, the company is required to disclose information that would render those statements not misleading." *Id.* (citing *City of Livonia Empls.' Ret. Sys. v. Wyeth*, 07 Civ. 10329, 2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010) (plaintiff adequately alleged omissions were material were SAEs not reported)).  Thus, "defendants' truthful but allegedly incomplete disclosures were misleading, because the complaint alleges insufficient facts were

---

[15]     *See* Tr. at 4:5-25, 11:10-12:8, 23:17-23, 24:23-25:14.  In the transcript, the court reporter referred to *Delcath* (phonetically) as the "DEL CAF" case.

disclosed to allow a reasonable investor to make an accurate assessment of the disclosures that were made." *Id.* (quoting *Kleinman*, 706 F.3d at 153 ("Statements of literal truth can become, through their context and manner of presentation, devices which mislead investors.")). Specifically, "Defendants made statements about their Phase III trial results, which given the allegations in the complaint, were misleading without disclosure of additional facts that would cast those results in a more negative light." *Id.* at 333.

Defendants ***ignore*** *Delcath* in their brief, literally failing to mention it even once. For their arguments to be credited, they must argue that *Delcath* was wrongly decided – yet they fail to even try. Indeed, they ignore an entire body of case law in harmony with *Delcath*. *See, e.g.*, *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 346 (E.D. Pa. 2014) (statements that the FDA said an NDA can be resubmitted based on pharmaceutical company's proposed reanalysis of trial results misleading where they omitted the FDA's statement that it is "unusual" for a company's proposed reanalysis to sufficiently support approval).[16] These cases support a finding that the FAC has satisfied its burden to plead false or misleading statements.

### 2. Defendants' Claims Of Blanket Immunity Fail

Defendants ask the Court to bless ***blanket*** immunity from federal securities liability via unique exemptions solely for pharmaceutical companies. *See* Memo at 13-21. Until the final moment when the FDA categorically rejects an application in a "binding decision," Defendants claim a blank check – even when they forego permissible silence and ***choose to speak*** in a manner contradicted by undisclosed negative facts. That is simply not the law.

---

[16]     *See also, e.g.*, *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *5-6 (E.D. Pa. Apr. 7, 2003) (defendants had duty to disclose contrary conclusions regarding efficacy despite arguing that such data was not considered fatal by FDA); *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *5, *8 (S.D. Cal. May 1, 2003) (duty to disclose FDA concerns about Phase 3 trials where defendants had publicly said the trial results met FDA approval requirements, thereby misleading as to FDA approval likelihood); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897-898 (E.D. Pa. 2018) (defendants had duty to disclose negative aspects of clinical data where they said that such data was sufficient to support a positive determination on safety and efficacy); *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 160–61 (D. Mass. 2004) (rejecting argument that defendants lacked duty to disclose FDA's "methodological criticisms" and finding nondisclosure to be a material omission from statements that FDA "asked for further explanation in several areas and requested additional data," where FDA expressed opinion that the clinical studies could not be salvaged and recommended more studies be done).

• **<u>There is no "binding decision" requirement</u>** (Memo at 13-14, 17, 20-21, 23). Defendants argue that unless the FDA issues a "binding decision," pharmaceutical companies cannot be held accountable for misstatements they ***choose*** to make regarding their drug candidates, clinical trials, approval applications, and engagements with FDA. Their cited appellate authority notes a generic need for "continuous dialogue" and "give and take" between companies and the FDA. *Id.* (citing *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) and *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 244 (1st Cir. 2015)). Yet, even those cases failed to codify the blanket exemption Defendants now seek. *See, e.g.*, *Sanofi*, 816 F.3d at 208 n.11 ("Because we affirm on the grounds that Plaintiffs failed to allege materially misleading omissions, we need not confront Plaintiffs' concern that the district court endorsed a bright-line test absolving issuers from any duty to disclose interim FDA feedback.").[17] Simply put, their cited authority does not alter the binding precedent mandating disclosure "when necessary 'to make…statements made, in the light of the circumstances under which they were made, not misleading," *Matrixx*, 563 U.S. at 37-38, and disclosure of the "whole truth" "once a company speaks on an issue or topic," *Meyer*, 761 F.3d at 250; *Vivendi*, 838 F.3d at 258 – regardless of whether the speaking defendants are engaged in an effort to secure FDA approval of a pharmaceutical product.

• **<u>There is no "interim feedback" exemption</u>** (Memo at 13-14, 17-21). Similarly, while there may be no affirmative, independent duty to disclose FDA's "interim feedback" when pharmaceutical companies choose to remain silent, they do not enjoy any special carveout from the federal securities laws and the binding precedent of *Matrixx* and its progeny when they ***choose to speak*** about their engagement with FDA, the sufficiency of their clinical trial data, and their pursuit of FDA approval. The analysis is necessarily fact-specific. Here, the FAC pleads a direct-line from September 2020 onward, with a peak of December 2021 to May 3, 2022, where at ***every*** step – from the pre-NDA meetings and  frenetic and "unusual" weekly inquiries to the March 2022

---

[17] The *Abiomed* court similarly found that the alleged misstatements and omissions at issue in the cited ruling had only "marginal materiality." 778 F.3d at 244.

deficiency letter and April 2022 LCM – the FAC reflects increasing details about the FDA's *consistent, unabating, and unmet* concerns regarding the ADAPT-PO trial data, its inclusion of gram-positive patients, and their impact on the required non-inferiority margin for tebipenem HBr, which halted Spero's efforts well before a full NDA review.  All the while, as discussed *supra*, Defendants chose to speak about the trail data sufficiency, their engagement with FDA, and their efforts to advance the NDA – and they had a duty to ensure those statements did not mislead.

Moreover, far from blessing any ironclad exemption for drug companies arising from *Sanofi* and *Alkermes*, [18] many courts have distinguished and limited them (or their core propositions).  *See, e.g.*, *Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *17 (S.D.N.Y. June 17, 2020) (while defendants may not have an affirmative duty to disclose information about FDA inspections and 483 letters, once they chose to speak about them, they had to do so accurately and completely).[19]  Indeed, contrary to the Memo at 14, the Second

---

[18]     The lower court opinions in both *Sanofi* and *Alkermes* are distinguishable.  As *Sanofi* noted, FDA's questions can arise "in random and sporadic fashion" but "tend to get answered in the process," and "[t]his case comfortably fits that profile," because FDA's core position and concerns "evolved over time" – nine years – on the sufficiency of a single-blinded study, and amounted to a "strong preference" but not a requirement for a double-blinded trial.  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 542, 545 (S.D.N.Y. 2015).  Here, the core timeline is 19 months, with a peak of just 5 months, and the factual record reflects consistent, unwavering FDA concerns that were never met.  In *In re Alkermes Pub. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 290-291, 294 (E.D.N.Y. 2021), the FDA "did not take a dim view" of the clinical trial, was attempting to understand its "pros and cons," consistently maintained that it would be a "matter of review" whether the trial approach could demonstrate efficacy, and ultimately did a full review of the filed NDA before issuing a formal letter rejecting it.  By contrast, here, any analogous positive steps *predated* the Class Period (QIDP designation in October 2017 (¶39), BARDA contract in July 2018 (¶44(d), Fast Track designation in March 2019 (¶44(g)), whereas the timeline during the Class Period, as discussed above, evidences "unusual" scrutiny and concerns by FDA that within a 5-month peak derailed the tebipenem HBr NDA altogether due to serious issues stemming from inclusion of gram-positive patients in the ADAPT-PO Trial and tebipenem HBr's potential to cause resistance to an entire drug category.

[19]     *See also, e.g.*, *Chabot v. Walgreens Boots Alliance, Inc.*, 2023 WL 2908827, at *17 (M.D. Pa. Mar. 31, 2023) (distinguishing *Sanofi*) (duty to speak without being misleading when defendants spoke about present state of regulatory approval process, with present reasons for confidence, based on present expressed and implied facts about process); *Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020) (failure to disclose interim FDA feedback actionable if needed to make statements not misleading); *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *7 n. 1 (D. Mass. Mar. 20, 2015) (distinguishing *Sanofi*) (duty to disclose FDA concerns and adverse trends threatening FDA approval although "ultimate FDA disapproval" could not have been known when statements and omissions made) and *6 (complaint sufficiently pled defendants misled investors by failing to disclose FDA's concerns about a drug when describing it as superior to a competitor); *Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at *5 (D. Mass. Feb. 15, 2018) (failure to include details about timeliness and accuracy of disclosed Item 503 risks regarding FDA's warnings at pre-NDA meetings could mislead reasonable investor); *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *8 (where defendants said clinical trial results met FDA approval requirements, had a duty to disclose FDA's concerns expressed in a meeting that shed serious doubt on trial sufficiency); *Khoja v. Orexigen*

Circuit reconfirmed statements of belief or opinion can be actionable for such companies where – as here – the complaint pleads facts whose omission makes them misleading.  *Tongue*, 816 F.3d at 210 ("[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." and "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at [the] time.'") (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015)).

Defendants emphasize that ***they*** told investors that FDA's March 2022 deficiency letter "does not reflect a final decision," so that, per their proposed immunity, they had no duty to disclose it (even though they did, and it caused investor losses, which they do not challenge). Memo at 20.[20]  Yet, Spero's May 3, 2022 press release was ***also hedged***, stating that the FDA's "review is still ongoing" and that "the FDA has not yet made any final determination regarding approvability."  ¶159.  So, under their blanket immunity, Defendants lacked ***any*** disclosure duty even then, thanks to their own self-serving characterization of the dialogue as interim and FDA's

---

*Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018) (when defendants touted interim results, duty to disclose FDA guidance they "have a high degree of uncertainty and were likely to change");  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597 (4th Cir. 2015) (scienter inference where defendants "fail[ed] to disclose critical information received from the FDA during the new drug application process, while releasing less damaging information that they knew was incomplete"); *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 331 & n.69 (E.D. Pa. 2020) (duty to disclose FDA disagreements with Phase 3 design plan because defendant chose to discuss trial design with investors, making such disclosures misleading); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 972 (D. Minn. 2014) (finding duty to disclose FDA letter that drug would not be approved, rejecting defense argument that it was not an outright rejection as a fact question premature to resolve at 12(b)(6) stage, and finding materiality evidenced by ultimate disclosure of letter followed by negative press).

[20]     Defendants take a leap from quoting their own press release characterizing the March 2022 deficiency letter as "not reflect[ing} a final decision" (*see* Memo at 20) to claiming that "the document itself" (*i.e.*, the letter), "informed Spero that the agency was not currently making the kind of 'final decision' that would trigger a duty to disclose" (*id.* at 21) – something the FDA had no reason to (and most assuredly did not) say.  Defendants also improperly seek judicial notice, without case law support, of the content FDA's policies and procedures regarding deficiency notices. *See* Memo at 20 n.3.  Plaintiffs respectfully oppose judicial notice of this document, because, even if Defendants had bothered to request it be taken, the document does not satisfy any of the grounds.  *See, e.g.*, *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 831 (S.D.N.Y. 2019) (limiting consideration at dismissal stage to documents attached to, incorporated by reference in, or integral to the complaint, public disclosures required to be filed with the SEC, or facts of which judicial notice may be taken). Moreover, Defendants wrongly seek to use the document as a backdoor way to *infer* what the contents of FDA's March 2022 deficiency letter *might* have been – when they *possess* the actual letter and could instead submit it for review by the Court.  That they avoid doing so speaks volumes and supports the *opposite* inference than the one they intended.

messaging as shy of a "binding decision" even where it made abundantly clear that the tebipenem HBr NDA was not approvable. In their view, so long as FDA never issued a "binding decision," they could continue presenting half-truths, like their post-LCM misstatements on May 2, 2022 (¶137), into perpetuity – or until they abruptly abandoned the NDA and laid of 75% of employees, and analysts demanded answers. This position is illogical, dangerous, and counter to the law.

### C.  The FAC Sufficiently Pleads A Strong Inference Of Defendants' Scienter

A plaintiff may sufficiently plead scienter by alleging facts showing that "defendants had both motive and opportunity to commit the fraud" or constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*., *Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The FAC pleads both bases for scienter in a robust, 15-page section that ties together its allegations and explains how they holistically support a strong scienter inference. ¶¶164-204. Defendants' challenges (Memo at 21-24) lack merit.

### 1.  The Knowledge And Recklessness Allegations

Contrary to the Memo at 21-23, the FAC pleads Defendants' knowledge or reckless disregard of numerous red flags and negative facts that rendered their public statements materially false or misleading. ¶¶165-175.

*Patient population risk*. Contrary to Defendants' argument (Memo at 22), as discussed above, the FAC adequately pleads that Defendants *knowingly* and unilaterally chose to under-enroll the ADAPT-PO Trial, contrary to the data review committee's recommendation, after its blinded reassessment of the sample size following response data from 70% of patients, that the trial be fully enrolled up to the protocol-allowed maximum of 1450 patients to ensure it would have a sufficient patient population to permit proper measurement of the endpoint, particularly given the pandemic. ¶¶55, 127, 168.[21] Defendants also knowingly included patients infected with

---

[21]   Defendants' miscite the New England Journal of Medicine ("NEJM") article, which ***does not*** (as they claim) state that the committee recommended enrollment of 1200-1450 patients. *See* Memo at 22. Instead, the article states "***we*** [the article authors] ***calculated*** that enrollment of approximately 1200 patients up to a maximum of 1450" would provide sufficient statistical power to assess a noninferiority margin of 10% (less than the threshold set by the FDA). *See* Sylvia Decl., Ex. G at 1329. Later in the same paragraph, the article states, "***The data review committee***

23

gram-positive bacteria and that ADAPT-PO Trial's comparison drug (IV ertapenem) was not approved to treat gram-positive bacteria in cUTI, which are resistant to it.  ¶¶52, 169.  These glaring red flags were known to (and *chosen* by) Defendants at the inception of the ADAPT-PO Trial and rendered statements that ADAPT-PO Trial met its endpoint and that the trial data will support FDA approval, at minimum, materially and misleading throughout the Class Period – and increasingly so as the FDA's intense scrutiny, heightened inquiries, and unusual concerns manifested themselves from September 2020 onward, as discussed *supra*.[22]  The FAC pleads that these risks had fully materialized, *e.g.*, by the March 2022 deficiency letter, given that CW5 thereafter worked on research to demonstrate to FDA that tebipenem HBr would be so under-prescribed that it would not increase risks of bacterial resistance to the full class of carbapenem drugs.  ¶¶52, 169.

*Trial data deficiencies.*  As described more fully above, Defendants were aware of ADAPT-PO Trial data deficiencies as the FDA increasingly raised concerns during Defendants' numerous meetings with the FDA starting in September 2020 through the end of 2021 with intensified and unusually high level of scrutiny between December 2021 and February 2022 as described by CWs and Defendants themselves.  ¶¶5-6, 41, 47-53, 56-57, 59, 63, 65, 67, 73, 77, 79, 87, 89, 91, 107, 109, 113, 115, 117, 123, 168-174.  The FDA's deficiency letter in March 2022 spelled out the issues, prompting CW5 to attempt to marshal pre-LCM research that would demonstrate that tebipenem HBr would be under-prescribed and not pose a risk of increasing gram-positive bacterial resistance to the entire carbapenem drug class.  ¶¶52, 169.  As Defendants concede, the LCM itself also spelled out the FDA's concerns about the ADAPT-PO Trial patient population and data.  ¶¶10, 159.  During this time period, Defendants' own suspicious conduct coincided with these red flags, including their letting high-level CW1 leave in February 2022 just before FDA sent its deficiency letter (¶¶48, 174), their tightly restricting access to the FDA

---

*recommended enrollment up to the protocol-allowed maximum of 1450 patients*."  *Id.*  It adds that Spero (the sponsor) consulted with the FDA *only* to revise the noninferiority margin to 12.5% due to the coronavirus pandemic - not "any" and all revisions, as Defendants claim.

[22]    These allegations give rise to securities fraud liability, based on what Defendants *said* to the market. Defendants' "mismanagement-of-clinical-trials" argument (Memo at 22) is a red herring.

submission and contents of the deficiency letter in April 2022 (¶¶49, 174), and their processing auto-deposits of severance pay for 75% of Spero's workforce in just five days post-LCM (¶¶10, 53, 174). Yet, Defendants continued to make misstatements about the ADAPT-PO Trial and tebipenem HBr's ability to treat gram-positive patients as described *supra*, without disclosing details of FDA's ultimate concerns.

Notably, "Defendants' disputes and denials of the facts alleged in the [F]AC are improper for a Rule 12(b)(6) motion to dismiss, where factual allegations are taken as true and viewed in a light most favorable to Plaintiffs." *Grund v. Delaware Charter Guar. & Tr. Co.*, 788 F. Supp. 2d 236, 245 (S.D.N.Y. 2011). Contrary to Defendants' argument (Memo at 16, 19-21), Plaintiffs need not pin down ***precisely when*** Defendants knew adverse facts – the FAC allegations more than suffice. *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000) (complaint need not "fix the exact date and time that [defendants] became aware" of information that rendered their accounting practices misleading).[23] As discussed *supra*, the FAC's allegations establish with increasing clarity over time that the FDA expressed concerns about the ADAPT-PO Trial's patient population and correlating data deficiencies from at least September 2020 through the April 2022 LCM.[24] Defendants' conduct given the FDA's concerns was, at minimum, deliberately reckless. *Delcath*, 36 F. Supp. 3d at 335-336. Defendants' proffered alternate inference is illogical and must be rejected for the reasons set forth below. *See* §III.C.6., *infra*.

### 2. The Motive And Opportunity Allegations

The FAC includes extensive motive and opportunity allegations. *See* §II.C., *supra*.

#### a. Suspicious Insider Transactions

The FAC pleads that Defendant Mahadevia engaged in insider transactions that were suspicious in amount, netting $278,157 during the Class Period (55.6% of 2019 base salary, 51.5%

---

[23] *See also Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *4 (S.D.N.Y. Aug. 1, 2005) (finding scienter allegations that "do not place a specific timeframe on these events" sufficient as "timing of these events is an issue of fact that cannot be determined at this stage of the proceedings").

[24] Defendants' primary case, *Alkermes*, 523 F. Supp. 3d at 286, 295 (Memo at 17-19), is distinguishable as there, the facts demonstrated that FDA did not take a "grim view" of trial methods at issue, whereas here, the record establishes Defendants' awareness of FDA's concerns starting in September 2020, increasing by December 2021, and most explicitly from March 2022 onward.

of 2020 base salary), and generating sale proceeds approximately 163% larger than his gains during the comparable pre-Class Period time.[25]  Defendants' pointing to the existence of a 10b5-1 trading plan is a non-absolute defense[26] that is premature at the Rule 12(b)(6) stage.[27]  If addressed, the argument should be rejected, as the existence of a 10b5-1 trading plan does not automatically negate the scienter inference, and here, the sales within the plan occurred very shortly after the alleged misstatements inflated the company's stock price and likely triggered the sales – *e.g.*, Defendant Mahadevia's December 27, 2021 stock sale, which is referenced by Defendants (Memo at 24), was made just days after making statements in connection with the Q2 2021 quarterly results, *e.g.,* that efforts around tebipenem HBr were supported by "strong clinical data" and "positive regulatory interactions with FDA." (¶¶101, 176).  Defendants' argument (Memo at 21, 24) that Mahadevia did not sell stock at the end of the Class Period is otherwise without merit, as the FAC adequately pleads that his stock sales were suspicious in timing.[28]

### b.  Suspicious Executive Compensation And Bonuses

Contrary to Defendants' Memo at 23, Plaintiffs adequately allege significant, suspicious executive compensation perks to Defendants Mahadevia and Shukla that conferred particularized and concrete benefits upon them – *i.e.*, Mahadevia's compensation increase during the middle of the fraud in 2021 was ~ 15% higher than his 2020 salary, and his bonus increased by 10% of his

---

[25]     *See George v. China Automotive Sys, Inc*., 2012 WL 3205062 at *10 (S.D.N.Y. Aug. 8, 2012) (net gains by defendants that were only slightly less than gross proceeds of their sales combined with other factors to demonstrate "unusual" trading activity).

[26]     Reliance on a Rule 10b5-1 trading plan in defense to a claim of insider trading requires an additional factual finding of "good faith" pursuant to 17 C.F.R. §240.10b5-1(c)(1)(ii), which the Court cannot do on a motion to dismiss. *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) (citing *In re Able Labs. Sec. Litig.*, 2008 WL 1967509 at *27 n.40 (D.N.J. Mar. 24, 2008).

[27]     *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ("existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved"); *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353 at *6 n. 11 (D. Md. May 13) (scienter pled by stock sales and that affirmative defense of 10b5–1 plan trading is "typically premature...in a motion to dismiss" even where the "sales were scheduled in advance of the class period"). Moreover, Defendants' selective submission of just one Form 4 for one trade at issue, instead of the 10b5-1 trading plan itself, so that the Court and Plaintiffs can evaluate it, underscores the problem with the Court's considering evidence at this stage, particularly pre-discovery when Plaintiffs are at an informational disadvantage.

[28]     *See In re Agean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 173 (S.D.N.Y. 2021) (scienter evidenced by sales at time of alleged withholding of negative corporate news); *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 484 (E.D.N.Y. 2001) ("unusual insider trading activity during the Class Period may permit an inference of bad faith and scienter").

base salary after receiving no bonus increases the two prior years; Shukla's employment agreement with suspicious, defensive provisions regarding termination, and his off-schedule salary raise after a few months at Spero in July 2021 – which strongly support the scienter inference.[29]

### c.   Spero's Unearned, Windfall Government Payments

The FAC pleads that Spero's continued acceptance of clinical trial reimbursement payments from the $59.7 million government contract (¶190-192), when it was aware that the ADAPT-PO Trial suffered from serious data deficiencies and the FDA had grave concerns that approval of tebipenem HBr would increase drug resistance to the full carbapenem drug class, further adds to the scienter inference.[30]   Defendants' argument as to contract's execution date (Memo at 24) ignores FAC's allegations that the contract provided Spero with additional funding over *5 years* (spanning the entire Class Period).  ¶44(d).

### d.   Spero Raised Funds During The Fraud

The FAC pleads that Spero's public offering with net proceeds of $74.7 million, which closed during the Class Period on September 15, 2020, *and* Spero's subsequent issuance and sale of stock on October 1, 2020 pursuant to the underwriters' exercise of their option, resulting in additional net proceeds of roughly $11.2 million, evidence corporate scienter arising from the motivation to complete the offering at an elevated price with the lowest possible share dilution. ¶¶186-189.  This timing aligns with when the FAC pleads pre-NDA meetings with the FDA began.

---

[29]     *See, e.g.*, *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (unusual bonus evidenced scienter); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 295 (S.D.N.Y. 2008) (suspicious executive compensation sufficient where plaintiffs alleged a concrete and particularized benefit); *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (even absent insider trading, scienter supported by allegations of executive compensation package based on company financial performance). Defendants' cited case, *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505 (S.D.N.Y. 2007) is inapposite, as plaintiffs merely alleged that defendants "wished to retain their jobs and compensation."

[30]     *See, e.g.*, *Beach v. Healthways, Inc.,* 2009 WL 650408, at *1-*5 (M.D. Tenn. Mar. 9, 2009) (allegations that defendants knew but failed to disclose company was not meeting and would not be able to meet terms of government contract, which might cause it to forfeit millions in fees and be ineligible for future phases of government work, sufficiently pled materially false and misleading statements and supported strong scienter inference).

¶¶6, 172.  Defendants' argument (Memo at 23) that they only raised funds during the first week of the Class Period is not only factually inaccurate, but also without merit.[31]

### 3.    The FAC's Core Operations Doctrine Allegations

The FAC implicates the core operations doctrine by pleading, *inter alia*, that Spero's development of tebipenem HBr was part of its "core business," was the most advanced of just three product candidates that Spero was reliant upon to generate revenues and growth, and given these facts along with Defendants' roles and status within Spero, and their personal involvement in key meetings and events at issue, it is inconceivable that Individual Defendants did not know the facts and circumstances of the fraud as alleged.  The FAC allegations, viewed holistically with the full scienter pleading, suffice.[32]

### 4.    Defendants Signed, Were Quoted In, SOX-Certified Misstatements

The FAC alleges that the scienter inference is bolstered by Defendants signing, being quoted in, and SOX certifying the alleged misstatements.  *See, e.g.*, *Plumbers and Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020) (SOX certifications support scienter).  Defendants' failure to argue otherwise waives the argument. *See* n.3, *supra*.

### 5.    Corporate Code of Conduct Violations

The FAC also pleads that Code of Conduct violations further support the scienter inference. *See, e.g. Perez v. Higher One Holdings, Inc.*, 2017 WL 4246775, at *8 (D. Conn. Sept. 25, 2017) (upholding scienter pleading based on briefing that included code of conduct allegations); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 n.7 (E.D. Mich. 2010)

---

[31]    Courts routinely find that offerings capitalizing on fraud-inflated securities values support scienter. *See, e.g. In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (motive to commit fraud survives motion to dismiss where misstatements allegedly increased stock price, permitting capital raise at higher offering price, with less shares issued and less dilution); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266 (S.D.N.Y. 2014) ($117 million offering evidenced corporate scienter, even when all individuals dismissed from the case); *Van Dongen v. CNinsure, Inc.* 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ($109.6 million secondary offering can provide motive for fraud).

[32]    *In re Salix Pharms, Ltd.*, 2016 WL 1629341, at *16 (fraud involving company's "key drugs" supported strong scienter inference); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (status of agreement "unquestionably within core operations" as it was a "significant source of income – 18% of projected 2012 revenues – critical to the long term viability of Hi-Crush"). Contrary to Defendants' argument (Memo at 23), in the Second Circuit, "allegations of a company's core operations…can provide supplemental support for allegations of scienter." *New Orleans Emps. Ret. Sys. v. Celestia, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (summary order).

28

(defendants' violation of their Ethics Code is a factor "supporting a strong inference of scienter"). By ignoring these allegations, Defendants waive any argument. *See* n.3, *supra*.

### 6.     Defendants' Competing Inference Is Not More Compelling

The FAC's allegations, which must be accepted as true and construed in the light most favorable to the Plaintiffs, rely on CW statements, circumstantial evidence, and logical inferences to establish that the FDA had ***one*** dominant, material concern during the Class Period regarding the ADAPT-PO Trial and the tebipenem HBr NDA – the inclusion of gram-positive patients and their impacts on the non-inferiority margin, given that gram-positive bacteria are resistant to the comparator drug (IV ertapenem), which is not approved for treatment of gram-positive infections. The FAC pleads with increasing detail over time the unusually high scrutiny, frenetic inquiries, and negative feedback that the FDA leveled at Defendants in a short period of time over this concern, culminating in the March 2022 deficiency letter and April 2022 LCM, which caused the NDA to be abandoned early as non-pursuable. Given *Tellabs*' disclaiming a need for "smoking gun" pleading, 551 U.S. at 324, the FAC adequately pleads a coherent, strong inference of scienter, arising as early as September 2020 and greatly strengthening by December 2021.

Defendants spill much ink lobbing semi-rhetorical questions and miscasting isolated FAC allegations to conjure "opposing inferences." Memo at 15-16. Yet, boiled down, their competing inference is based on a ***fickle FDA***. They spin the FAC's allegations to suggest the top U.S. drug regulator waited until the last moment to "radically" pull the rug out from under them and declare, out of thin air at the "eleventh hour" during the LCM on April 28, 2022, that gram-positive patients did not belong in the ADAPT-PO Trial data, in a complete bait-and-switch that ran counter to all prior guidance. They offer no motive or explanation for this purported regulatory abuse, nor any credible explanation as to what *other* deficiencies the FDA purportedly raised in March 2022 that would have forced Spero to make a stock-dropping public disclosure given its view of near-total immunity from any duty of disclosure of "interim" FDA feedback. Their tale depends on, *inter alia*, ignoring the CW statements (particularly that of CW5) and believing that the FDA gave no advance warning whatsoever, *e.g.*, in its March 2022 deficiency letter, the contents of which they

29

withheld from employees, investors, and, now, this Court, despite copiously augmenting the record with hundreds of pages of judicial notice materials. Yet, those circumstances would be even ***more*** "'at odds with the FDA's aversion to making 'major changes, such as revising the primary efficacy measures, in the late stage of a clinical trial'" (Memo at 19) – and thus more illogical – than if the FDA had expressed its serious, trial-risking concerns at the many earlier points in time that the FAC pleads were the actual time frame and that support Plaintiffs' inference.

Defendants' competing inference runs counter to the pleadings and is utterly illogical, and for that reason alone should be rejected. *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at \*33 (S.D.N.Y. Mar. 23, 2017) ("opposing inference rests on the illogical premise" and therefore is "less persuasive on its face"); *In re Forcefield Energy Inc. Sec. Litig.*, 2017 WL 1319802 at \*9 (S.D.N.Y. Mar. 29, 2017) (crediting plaintiff's inference as the "most logical one"); *In re Salix Pharms, Ltd.*, 2016 WL 1629341, at \*16 (defendants' scienter arguments fail, in part, because they do not present a "cogent non-fraudulent inference" or "any rational inferences of benign intent"). Even if considered, *Tellabs* requires their inference to be ***more*** compelling than Plaintiffs' inference to justify dismissal. Plaintiffs respectfully submit that Defendants' inference falls short.

### E.     The FAC States A Control Person Claim Under §20(a)

Defendants' lone challenge is failure to plead the underlying §10(b) claim. Memo at 24. If the §10(b) claim is upheld, in whole or in part, the §20(a) claim must survive.

## IV.   CONCLUSION

For reasons, Lead Plaintiffs respectfully ask the Court to deny Defendants' Motion.[33]

---

[33]     If the court dismisses, Plaintiffs respectfully request it be without prejudice and with leave to further amend. *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 312-313 (granting leave to amend twice-amended complaint and noting "general policy that leave to amend should be granted liberally in cases alleging securities fraud"); *Loreley Fin. (Jersey) No.3 Ltd.*, 797 F.3d at 191 (Second Circuit encourages amendments, particularly when case "combines a complex commercial reality with a long, multi-prong complaint," and district court's denial of amendment "violated the liberal spirit of Rule 15").

Dated: May 31, 2023

Respectfully Submitted,

**POMERANTZ LLP**

*/s/ Matthew L. Tuccillo*
Jeremy A. Lieberman
Matthew L. Tuccillo
Jennifer Banner Sobers
Brandon M. Cordovi
600 Third Avenue, 20th floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
        mltuccillo@pomlaw.com
        jbsobers@pomlaw.com
        bcordovi@pomlaw.com

*Plaintiffs' Lead Counsel*

THE SCHALL FIRM
Brian Schall (*pro hac vice* forthcoming)
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Memon*

GLANCY PRONGAY & MURRAY LLP
Charles H. Linehan (*pro hac vice* forthcoming)
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495
clinehan@glancylaw.com

*Additional Counsel for Plaintiff Saad*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2023, I served the foregoing on Defendants' counsel via email, in accordance with the Court's instructions.

Dated:    May 31, 2023                    /s/ *Matthew L. Tuccillo*
                                          Matthew L. Tuccillo