UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SPERO THERAPEUTICS, INC. SECURITIES LITIGATION | Case No.  1:22-cv-03125-LDH-RLM |
| THIS DOCUMENT RELATES TO: All Actions | <u>CLASS ACTION</u><br><br>DEFENDANTS' REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS |

### <u>DEFENDANTS' REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT</u>

John F. Sylvia, Esq.
**MINTZ, LEVIN, COHN, FERRIS GLOVSKY, AND POPEO, P.C.**
919 Third Avenue
New York, NY 10022
Tel:  (617) 542-6000
Fax:  (617) 542-2241
Email: JFSylvia@mintz.com

*Attorney for Defendants Spero Therapeutics, Inc., Ankit Mahadevia and Satyavrat Shukla*

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.     Rule 12(b)(6) Requires The Plaintiff To Plead Facts (Not Conclusions) Which Show (Not Allege) That He Or She Has A Plausible (Not Possible) Claim For Relief. ........ 2

    II.    Law: The Opposition Attacks A Straw Man And Misstates The Applicable Legal Standard. ..................................................................................................................... 2

    III.   Facts: There Is A Hole At The Center Of The First Amended Complaint. .................. 6

    IV.   Representations In A Brief Are An Impuissant Surrogate For A Record Showing. .. 14

CONCLUSION .................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................2, 8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................2

*Bythewood v. New York*,
2022 U.S. Dist. LEXIS 180011 (E.D.N.Y. Sep. 30, 2022)......................................12

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir.2002)......................................................................................12

*Extenet. Sys., Inc. v. Village of Plandome*,
2021 U.S. Dist. LEXIS 186651 ...............................................................................14

*Geisler v. Petrocelli*,
616 F.2d 636 (2d Cir. 1980)........................................................................................2

*Gooley v. Mobil Oil Corp.*,
851 F.2d 513 (1st Cir. 1988)......................................................................................15

*In re Alkermes Pub. Co. Sec. Litig.*,
523 F. Supp. 3d 283 (E.D.N.Y. 2021) ................................................................ *passim*

*In re Delcath Sys. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014).......................................................................5, 6

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y, 2003)........................................................................2

*In re Sanofi Secs. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015).......................................................................4, 7

*MedImmune, Inc. Sec. Litig.*,
873 F. Supp. 953 (D. Md. 1995)................................................................................6

*Mucha v. Winterkorn*,
2022 U.S. App. LEXIS 6597 (2d Cir. Mar. 15, 2022)...............................................8

*Oklahoma Police Pension Fund and Ret. Sys. v. Teligent, Inc.*,
2020 WL 3268531 (S.D.N.Y. June 17, 2020) ........................................................5, 6

*Oppenheimer & Co. v. Trans Energy, Inc.*,
946 F. Supp. 2d 343 (S.D.N.Y. 2013)........................................................................2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................................11

*Tongue v. Sanofi*,
    816 F.3d 199(2d Cir. 2016)........................................................................... *passim*

*Weisman v. LeLandais*,
    532 F.2d 308, 311 (2d Cir. 1976)..........................................................................2

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (3d Cir. 2015)...................................................................................3

**Statutes**

Private Securities Litigation Reform Act of 1995 ....................................................1, 11

**Rules**

Rule 8 ..................................................................................................................2

Rule 12(b)(6)......................................................................................................2, 11

## INTRODUCTION

The Defendants submit this memorandum in reply to the Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (cited here as "Opp. --). Under the particular circumstances of this case—where the gist of the claims is that the defendants omitted feedback received from the U.S. Food and Drug Administration during the development of a new drug— the omissions are not actionable as a matter of Second Circuit law unless there is, at the very least, a "serious conflict" between the defendants' public statements and information conveyed to the defendants by the agency. *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016). In a brief that is short on record facts and legal support but long on hyperbole and typographical overemphasis, the Plaintiffs argue against the application of this principle, contending that to do so would be to grant pharmaceutical companies "blanket immunity" from claims under the Private Securities Litigation Reform Act of 1995 ("PSLRA").

This is untrue. It is also irrelevant. The PSLRA requires every securities-fraud plaintiff to plead ***facts*** sufficient to generate, among other things, a strong inference of scienter. The Plaintiffs have failed this basic and universal test. Their First Amended Complaint ("FAC") says nothing useful about the information conveyed to Defendants by the FDA at the relevant times, and thus gives the Court no basis upon which to perform the comparative analysis needed to determine whether there was any conflict at all, much less a "serious" discrepancy, between what the agency told the company and what the company told investors. Especially given the Plaintiffs' self-advertised insight into the FDA's interactions with Spero—insight supposedly derived from confidential witnesses who held "high-level" positions at the company and had been brought "into the tent" about its regulatory dealings—this is a fatal lapse that requires dismissal, with prejudice, of the Plaintiffs' second fruitless attempt to state a viable claim.

## **ARGUMENT**

**I.      Rule 12(b)(6) Requires The Plaintiff To Plead Facts (Not Conclusions) Which Show (Not Allege) That He Or She Has A Plausible (Not Possible) Claim For Relief.**

The Opposition cites *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980), *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y, 2003), and *Weisman v. LeLandais*, 532 F.2d 308, 311 (2d Cir. 1976), to support its description of the supposedly-applicable Rule 12(b)(6) standards. Opp. at 7-8. These cases, however, were decided before the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and they applied "a now defunct standard for a motion under Rule 12(b)(6)." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 n. 4 (S.D.N.Y. 2013) (criticizing plaintiff's reliance on *Geisler*).

At the same time, the Opposition ignores the critical lessons of the Supreme Court's intervening Rule 12(b)(6) jurisprudence: that Rule 8 requires a plaintiff not just to *allege* that he or she is entitled to relief, but to "show" it, *Iqbal*, 556 U.S. at 677; that to survive a motion to dismiss, a complaint therefore must contain "sufficient factual matter" to state a claim for relief that is "plausible on its face," *id.* at 678; and that where the "well-pleaded facts" do not permit the court to infer more than the mere "possibility" of misconduct, the claim is not plausible and the complaint has not shown that the pleader is entitled to relief. *Id.* at 679.

**II.     Law: The Opposition Attacks A Straw Man And Misstates The Applicable Legal Standard.**

The Opposition accuses the Defendants of claiming "that pharmaceutical companies enjoy a unique carveout from the federal securities laws and binding Supreme Court precedent...." Opp. at 1. The Plaintiffs go on to contend that "Defendants ask the Court to bless ***blanket*** immunity from federal securities liability via unique exemptions solely for pharmaceutical companies," *id.* at 19 (emphasis in original), that "Defendants claim a blank check," *id.*, that they seek a "blanket

2

exemption," *id.* at 20, and an "ironclad exemption" from liability under the securities laws. *Id.* at 21.

It would be an understatement to call this "hyperbole," as the Court did when rejecting much the same argument in *In re Alkermes Pub. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 293 n. 4 (E.D.N.Y. 2021). The Court did not "view the standard so expansively" in *Alkermes*, *id.*, and it need not do so here. It is enough to note, as the Second Circuit did in *Gen. Partner Glenn Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), that "context is instructive," that "[c]ontinuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process," *id.* at 211 (citations omitted), and that the absence of "serious conflict" between FDA feedback and a proponent's public statements will therefore be "fatal to Plaintiffs' case" where, as in *Tongue* (and *Alkermes*, and this case) the gist of the securities-fraud claim is that the defendants failed to disclose the FDA's side of the "continuous dialogue" while it was ongoing. *Id.* at 212.

As the Plaintiffs acknowledge, "[t]he analysis is necessarily fact-specific." Opp. at 20. More particularly, the analysis requires the Court to compare two sets of facts: it "necessarily involves consideration of the facts and the nature of the alleged omissions . . . within the context of the statements that a defendant affirmatively made." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 611 (3d Cir. 2015). *See also* Opp. at 22, n. 19 (citing *Zak*).

Thus, to determine whether a pharmaceutical company had a duty to disclose FDA feedback (and whether its representatives acted with scienter by not doing so), the Court must compare (1) what the FDA said to the company, to (2) what the company said to investors. So, for example, in *Alkermes*, this Court decided that the complaint did not state a viable claim after comparing the specific "concerns" expressed by the FDA about the methodology used in the proponent's clinical trial, to the specific statements made by the defendants to investors. *In re*

3

*Alkermes*, 523 F. Supp. 3d at 293-295. It could perform this analysis because the complaint alleged both the defendants' public statements and facts describing the substance of the FDA's expressions of concern: that the agency could not say whether the clinical trial's "novel design" would be reliable, *id.* at 288; that it had not endorsed the company's proposed analytical method, *id.*; that it generally did not accept late-arising changes in methodology for statistical analysis, such as had been proposed by the company, *id.* at 289; that it had not previously accepted the efficacy endpoint proposed by the company, *id.*; and that it did "not agree" with a particular aspect of the company's proposed methodology. *Id.* In performing this comparative analysis, the Court looked beyond the plaintiff's characterizations of the FDA's feedback, to focus on the actual content of those communications as alleged in the complaint. *Id.* at 293-94 (noting that plaintiff had "overstated the import of the information—the 'concerns'—conveyed by the FDA to Defendants," and recounting the agency's actual statements to defendants).

The Court thus knew, in considerable detail, what the FDA had said to Alkermes when it concluded that the record did not "reveal any information conveyed [by the agency] that should reasonably have been interpreted to suggest that FDA approval [of the proposed drug] was not possible or even unlikely." *Id.* at 294. Likewise, in *In re Sanofi Secs. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd Sanofi*, 816 F.3d 199, the District Court dismissed the claims only after reviewing the complaint's description of the FDA's "methodological commentary" to the defendant, *id.* at 519-520, and concluding, on the basis of what the agency had actually said to Sanofi, that "the FDA's methodological commentary cannot be fairly depicted—as plaintiffs characterize it—as tantamount to a statement that [the drug] could not or would not obtain timely FDA approval." *Id.* at 541.

The same is true of the cases, cited by the Plaintiffs in the Opposition, that supposedly "distinguished and limited" the decisions in *Alkermes* and *Sanofi*. For example, in *Oklahoma Police Pension Fund and Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531 (S.D.N.Y. June 17, 2020), the District Court allowed the case to proceed with respect to the defendants' statements that Teligent had *not* received any "483 Letters" from the FDA, when the complaint alleged that the company had already received one such letter, and that its manufacturing facilities were in such disarray that it would soon receive several more.[1] *Id.* at *16-17.

The District Court in *Teligent* noted a lack of uniformity in the case law over whether receipt of a 483 Letter, in and of itself, was a disclosable event. There was no need to take a side in that controversy, however, because what distinguished *Teligent* from *Sanofi*—where the Court held that the defendant had no duty to disclose other kinds of FDA feedback—was the fact that Teligent had not only *received* a 483 Letter, but had repeatedly told investors that it had *not* received one: "that distinction made all the difference." *Id.* at *17. Again, the analysis depended on the Court's ability to compare what the FDA had told defendants ("here is a 483 Letter") to what the defendants had told investors ("we have not received any 483 Letters").

The other decision on which the Plaintiffs primarily rely is *In re Delcath Sys. Sec. Litig.*, 36 F. Supp. 3d 320 (S.D.N.Y. 2014). *See* Opp. at 18-19. The Plaintiffs claim that "Defendants *ignore Delcath* in their brief," and that for the Defendants' "arguments to be credited, they must argue that *Delcath* was wrongly decided...." Opp. at 19. This is incorrect. *Delcath* is irrelevant for two reasons. First, the "omitted" information in that case was not conveyed to the company by FDA as part of the "continuous dialogue" that marks the drug licensing process; what the

---

[1]    A "483 Letter" is a letter issued by the FDA to management "at the end of an inspection when the investigator has observed conditions that may constitute violations of applicable regulations." *Id.* at *3.

defendants in *Delcath* had not publicly disclosed, rather, was data from their own clinical trial (specifically, the fact that patients treated with the company's new device had experienced many more serious adverse events, including deaths, than patients in the "control" group). *Id.* at 331-332. The decision in *Delcath*, therefore, did not—because it did not need to—take into account the practical and policy considerations underlying the principles applied in *Alkermes* and *Sanofi*. *See, e.g., MedImmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995) (if a company discloses non-final FDA feedback and the "bad news" does not materialize, "Defendants might then find themselves defending the opposite of the present lawsuit").

Second, the *Delcath* decision has no relevance here because the complaint in that case—like the complaints in *Teligent*, *Alkermes*, and *Sanofi*, but unlike the FAC—contained enough factual material to enable the Court to perform the necessary factual analysis, *i.e.*, the comparison between what the defendants knew and what they told investors. The basis of the decision in *Delcath* was the District Court's conclusion that "the defendants 'knew facts or had access to information suggesting that their public statements were not accurate,'" 36 F. Supp. 3d at 334-335 (citation omitted), and the Court was able to reach that conclusion because the complaint told it what the defendants had known but omitted from their public statements. *Id.* at 331-332.

## III.     Facts: There Is A Hole At The Center Of The First Amended Complaint.

The FAC is therefore defective even if a pharmaceutical company might—in case like *Teligent*, for example, where the company told investors that it had not received a 483 Letter when it in fact had received one—acquire a duty to disclose FDA feedback that falls short of "facts [that] will necessarily prevent regulatory approval...." *In re Alkermes*, 523 F. Supp. 3d at 293 (quoting *In re Sanofi*, 87 F. Supp. 3d at 529). The essential flaw in the First Amended Complaint is that it has no factual foundation. The Plaintiffs had the benefit of debriefing several former Spero

6

employees, including CW2, a director in the Regulatory Affairs Department who had access to "all the FDA submission documents" in the company's possession, FAC, ¶49, and CW5, a "high-level employee" who was "brought 'into the tent'" and knew "what was happening vis-à-vis the FDA." FAC, ¶¶29, 52. Nevertheless, the FAC fails to allege any facts indicating what the FDA said to Spero about the composition of the patient population for the ADAPT-PO trial or, if so, when the FDA said it. There is nothing in the FAC remotely like the allegations in *Alkermes*, where the plaintiffs quoted at length the feedback conveyed by the FDA, *In re Alkermes*, 523 F. Supp. 3d at 288-290, or the allegations in *Sanofi*, where the complaint recounted the specific words the FDA used to convey its comments and criticisms to the new drug's proponent. *In re Sanofi*, 87 F. Supp. 3d at 519-520.[2]

This gap is fatal. It means that the FAC does not enable the Court to even *perform* the requisite comparative analysis, much less to plausibly conclude that there was a "serious conflict," *Tongue*, 816 F.3d at 212, between what the FDA said to Spero and what Spero said to investors. The Plaintiffs try to fill this gap with hindsight and circumstantial allegations. Neither is up to the task.

---

[2]     According to the FAC, CW5 reported that he or she "gleaned from discussions around the LCM meeting" that the FDA wanted to effectively amend the study protocol to exclude patients infected with gram-positive bacteria. FAC, ¶52. Note the FAC's failure to specify who participated in the "discussions," as well as the presumably deliberate use of the vague qualifier "around," which could mean that CW5 gleaned this information shortly before *or after* the Late Cycle Meeting at the end of April (which immediately preceded Spero's full disclosure of the FDA's concerns in the beginning of May). For that reason, the record is at least unsupportive of—if not flatly inconsistent with—the Plaintiffs' contention in their brief that CW5 "learned ***during*** those preparations—***before*** the LCM—that FDA wanted to remove gram-positive patients" from the study population. Opp. at 13 (emphases in original).  As a practical matter, the timing is irrelevant insofar as the FAC does not allege that CW5's (or the Defendants') purported receipt of this alleged information pre-dated any of the Company's prior disclosures regarding interaction with FDA.

7

**Hindsight**. Try as the Plaintiffs might to justify their reliance on allegations about the more conclusive feedback eventually conveyed by the FDA at the Late Cycle Meeting at the tail end of the Class Period in late April 2022 (and promptly disclosed by Spero), Opp. at 12, n. 4, those allegations are not well-pleaded and cannot, as a matter of law, support a retrospective inference that the Defendants were aware of the FDA's ultimate position during the preceding months. *Mucha v. Winterkorn*, 2022 U.S. App. LEXIS 6597, at *8 (2d Cir. Mar. 15, 2022).

In any event, the hindsight allegations do not suggest anything more than the possibility that the FDA had previously communicated *something* about the composition of the patient population to Spero. This is insufficient as a matter of law. *Iqbal*, 556 U.S. at 679 (a complaint is inadequate where the facts alleged do not permit the court to infer more than the mere "possibility" of misconduct). The inference the Plaintiffs want and need the Court to draw—that the FDA had not just expressed concerns or criticism, as in *Alkermes* and *Sanofi*, but had informed Spero that the results of the ADAPT-PO trial would "necessarily prevent regulatory approval," *In re Alkermes*, 523 F. Supp. 3d at 293, or otherwise present a "serious conflict" with the company's public statements, *Tongue*, 816 F.3d at 212—is both attenuated and implausible. If the agency had made up its mind before the Late Cycle Meeting, and if it had communicated that decision to Spero in a way that might give rise to a strong inference of scienter and/or a duty to disclose, there would have been no need to hold the meeting at all. The necessary inference, then, is refuted by the indisputable fact that the meeting took place.

**Circumstance**. Unable (or unwilling) to tell the Court what the FDA actually said to Defendants during the putative Class Period, the Plaintiffs try to conjure up an inference that it must have been bad news from a handful of circumstantial allegations, which they ominously characterize as "*many* other red flags," Opp. at 5 (emphasis in original), including: (1) that a "data

8

review committee" supposedly "recommended using a larger patient population than what Defendants chose," (2) that Spero "faced increasingly intense scrutiny" from the FDA during the review process, and (3) that Spero received a "deficiency letter" from the FDA in late March 2022, which supposedly "put [the Defendants] on notice ... of the FDA's serious concerns" about the composition of the patient population for the ADAPT-PO Trial. *Id.*

None of this is remotely sufficient to the task of generating a strong inference of scienter. First, the data review committee allegation is a red herring. At worst, it suggests that when the investigators enrolled a total of 1,372 patients into the ADAPT-PO trial, exceeding by a considerable number the 1,200-patient minimum specified in the FDA-approved study protocol, they nevertheless fell short (by a much smaller number) of the data review committee's recommendation that the trial enroll 1,450 patients (the maximum allowed by the protocol) in order to provide it with sufficient statistical "power" for "the assessment of the primary endpoint within a noninferiority margin of 10%," as initially contemplated in the protocol.

But the source of the allegations—not the data review committee's actual report, but a second-hand account from a journal article—indicated (1) that it would have been difficult to achieve maximum enrollment "owing to the coronavirus disease 2019 epidemic and the resulting operational challenges to recruitment," and (2) that the investigators, "*in consultation with the FDA*," instead revised the primary endpoint of the trial from the original 10% noninferiority margin to a new benchmark of 12.5%. The Plaintiffs have yet to explain how that revision—which was made in consultation with the FDA, and which compensated for the pandemic-driven shortfall in recruitment by expanding the parameters for clinical success by 25%—could generate an inference of scienter. The Plaintiffs' heavy emphasis on this allegation is indicative only of their desperation to find any factual reed, however slender, on which to hang a securities-fraud claim.

9

Second, the Opposition returns again and again to the frequency of the FDA's communications with Spero during the pendency of its New Drug Application, which the Plaintiffs characterize as "suspicious," Opp. at 13, and otherwise sensationalize with florid language, including an incantatory reliance on the word "frenetic." *See, e.g., id.* at 3 ("intense weekly scrutiny"); 4 ("FDA's scrutiny intensified and it grilled Defendants with volumes of questions/concerns"); 5 ("increasingly intense scrutiny"); 6 ("numerous meetings and interactions ... peaking with intensified and unusually high scrutiny"); 11 ("escalating scrutiny"); 12 ("frenetic scrutiny" and "weird" scrutiny levels); 17 ("frenetic and unusual engagement with Spero"); 24 ("intensified and unusually high level of scrutiny"); 29 ("unusually high scrutiny" and "frenetic inquiries").

Of course, here as in the rest of the Opposition and the FAC, there is no real substance to the allegations: the Plaintiffs never once allege a single *fact* indicating the actual *content*—or, for that matter, the actual frequency—of the supposed regulatory "scrutiny," much less the manner in which it supposedly "escalat[ed]," reached "frenetic" levels, or "peak[ed]." Stripped of adorning verbs and adjectives, and reduced to its functioning parts, the Plaintiffs' theory, apparently, is to let the frequency of the FDA's communications do all the work: if the FDA was talking regularly to Spero about it New Drug Application, then there *must* have been something wrong with the application; that "something" *must* have been the composition of the study population; and the FDA's concerns *must* have been communicated sufficiently early, and in sufficiently specific and concrete terms, as to give rise to a duty to disclose them during the Class Period, and to generate a strong inference of scienter in connection with their non-disclosure under the principles articulated in *Sanofi* and applied by this Court in *Alkermes*.

10

But the chain of inferences falls apart at the first link because, under the circumstances, there was nothing suspicious at all about the pace of the FDA-Spero interactions during the review process for tebepinem. A far more cogent and compelling, and completely nonculpable, explanation is at hand. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (to survive scrutiny under Rule 12(b)(6) and the PSLRA, a securities-fraud complaint must generate an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged"). The Plaintiffs themselves allude to this explanation, when they acknowledge that the FDA's Fast Track Designation "meant more frequent interactions with the FDA." Opp. at 2. Regulatory interactions were frequent because the regulatory pace was fast, and the pace was fast because the regulators saw, in tebipenem, a promising drug that could fill an unmet need. FAC, ¶¶37, 39, 41. As the FDA itself puts it: "Once a drug receives Fast Track designation, early and frequent communication between the FDA and a drug company is encouraged throughout the entire drug development and review process. The frequency of communication ensures that questions and issues are resolved quickly, often leading to earlier drug approval and access by patients." U.S. Food and Drug Administration, Fast Track (Jan. 4, 2018).[3]

Finally, there is the so-called "deficiency letter," which Spero received from the FDA at the end of March 2022. The Plaintiffs cannot deny that Spero promptly disclosed its receipt of the FDA Letter to investors. FAC, ¶8. Instead, they take the Defendants to task for not disclosing the FDA Letter itself, either to investors, or to Spero's employees in general, Opp. at 6, 13, 22, or to the Court, Opp. at 1, 22 n. 20. According to the Plaintiffs, it was wrong of the Defendants to refer to the FDA's own policies and procedures regarding "deficiency notices" as "a backdoor way to

---

[3]     https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review-fast-track. *See also In re Alkermes*, 523 F. Supp. 3d at 287, n. 3 (citing and quoting same source document).

*infer* [sic] what the contents of the FDA's March 2022 deficiency letter might have been—when they **possess** the actual letter and could instead submit it for review by the Court. That they avoid doing so speaks volumes and supports the *opposite* inference than the one they intended." *Id.* at 22, n. 20 (all emphases in original).

The Plaintiffs, finally, are right about one thing. The Defendants *do* possess the FDA Letter and—given the heavy reliance that the Plaintiffs have placed on the document, rendering it integral to the Complaint—they agree that the Court can and should consider its actual contents. *Bythewood v. New York*, 2022 U.S. Dist. LEXIS 180011, at *2, n.1 (E.D.N.Y. Sep. 30, 2022) (quoting *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) First, here is what Spero publicly disclosed about the FDA Letter: "The U.S. Food and Drug Administration (FDA) has notified Spero that, as part of its ongoing review of Spero's New Drug Application (NDA) for tebipenem HBr, it has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time." FAC, ¶8.

And here is the Letter, in its entirety:

12



Declaration of John F. Sylvia, Ex. A.

With the document in hand, the Court can perform the requisite comparative analysis,

which shows that, with respect to the FDA letter, there was no conflict between what the FDA told

Spero and what Spero told investors (and employees), and therefore no basis for a securities-fraud

claim. If Spero "omitted" anything of substance from its press release, it was only the FDA's

additional assurance that "[t]his notification does not reflect a final decision on the information under review." Sylvia Aff., Ex. A. But that omission cannot possibly be actionable. This Court held in *Alkermes* (quoting *Sanofi*) that scienter "arises in this context, where 'the management knows that certain facts ***will*** necessarily prevent regulatory approval . . . and conceals those facts from the investing public.'" *In re Alkermes*, 523 F. Supp. 3d at 293 (citation omitted) (emphasis added). One would have to turn those holdings upside-down and inside-out to conclude that scienter may arise where management knows and discloses certain facts conveyed to it by the FDA, but does not disclose the agency's further, explicit assurance that the disclosed facts will ***not*** necessarily prevent regulatory approval.

## IV.    Representations In A Brief Are An Impuissant Surrogate For A Record Showing.

Because the law is not in their favor and the facts are absent, the Plaintiffs end up, as the saying goes, "pounding the table." *See Extenet. Sys., Inc. v. Village of Plandome*, 2021 U.S. Dist. LEXIS 186651, at *1 ("If you have the facts on your side, pound the facts; if you have the law on your side, pound the law; if you have neither the facts nor the law, pound the table"). Using typographical tricks—italics and bold type—to convey a false impression of significance, the Plaintiffs repeatedly invite the Court to accept characterizations for which there is not a scrap of record support. A full catalog of these aggressive but empty assertions would cause the Defendants to exceed the page limitation for this reply brief, but here is a representative sample:

- "Defendants were ***increasingly on notice*** that the ***FDA*** had ***growing concerns*** arising from ***facts*** concerning the ADAPT-PO trial about which Defendants had been fully aware ***throughout*** their public statements." Opp. at 9-10 (emphases in original).

- "[T]he FDA's ***escalating*** scrutiny, concerns, and feedback repeatedly put them ***on notice*** that those risks had ***materialized***...." *Id.* at 11 (emphases in original).

- Defendants' statements created "an impression ***wholly untethered*** to the realities, gravity, and focus of FDA's concerns and intentions...." *Id.* at 14 (emphasis in original).

- "Defendants' spin of the alleged facts *fails to explain* the FDA's frenetic and unusual engagement with Spero over its clinical data...." *Id.* at 17 (emphasis in original).
- "[T]he FAC reflects increasing details about the FDA's *consistent, unabating, and unmet* concerns regarding the ADAPT-PO trial data...." *Id.* at 21 (emphasis in original).

As the Court has seen, none of these statements is supported by well-pleaded allegations of fact. "[R]epresentations in a brief," meanwhile, "are an impuissant surrogate for a record showing." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 n. 2 (1st Cir. 1988). And the record—that is, the FAC and the other sources upon which the Court can properly rely—gives the Court no basis on which to assume, even for pleading purposes, what the "realities, gravity, and focus of the FDA's concerns" were during the putative Class Period, much less that they were "consistent, unabating, and unmet," or that they put the Defendants "increasingly on notice" that their public statements were "wholly untethered" to such "realities."

## CONCLUSION

The Court should dismiss the First Amended Complaint with prejudice.

DATE:  June 21, 2023

Respectfully submitted,

John F. Sylvia, Esq.
**MINTZ, LEVIN, COHN, FERRIS
 GLOVSKY, AND POPEO, P.C.**
919 Third Avenue
New York, NY 10022
Tel:  (617) 542-6000
Fax:  (617) 542-2241
Email: JFSylvia@mintz.com

*Attorney for Defendants Spero Therapeutics, Inc., Ankit Mahadevia and Satyavrat Shukla*

15